IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

JOSEPH HOPKINS, et al.     §
                      § CIVIL ACTION NO. 4:05-CV-332-Y
VS.                         §
                      § <u>Consolidated with Civil Actions</u>:
CORNERSTONE AMERICA, et al. §  4:05-CV-333-Y; 4:05-CV-334-Y

ORDER PARTIALLY GRANTING
AND PARTIALLY DENYING DEFENDANTS'
MOTION TO DISMISS OR IN THE ALTERNATIVE
FOR SUMMARY JUDGMENT AND PARTIALLY GRANTING
<u>PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

Plaintiffs Joseph Hopkins, et al., are former insurance agents of defendants Cornerstone America, et al., who have filed suit for unpaid overtime wages and retaliation under the Fair Labor Standards Act ("FLSA"), breach of contract, and common-law fraud and conversion.[1]  The Court has before it Defendants' motion to dismiss or, in the alternative, for summary judgment (doc. #80), and Plaintiffs' motion for partial summary judgment (doc. #84). Both parties' motions call upon the Court to decide whether, under the FLSA, Plaintiffs were employees of Defendants or independent contractors.  After review of the motions, responses, replies, and appendices, the Court concludes that it has subject-matter jurisdiction, that all of the Plaintiffs, with the exception of Chris Fox, were employees of Defendants, and that Defendants' termination of Plaintiffs' employment contract violated public

---

[1] In their response to Defendants' motion to dismiss or in the alternative for summary judgment, Plaintiffs have advised the Court that they "no longer intend to seek submission of their common law claims for fraud and conversion." (Pls.' Resp. Defs.' Mot. Dismiss at 1).  Accordingly, the Court will dismiss these claims.

policy.

I.    Factual Background

Defendant Cornerstone America ("Cornerstone") is the marketing and sales division of defendant Mid-West National Life Insurance Company of Tennessee ("Mid-West").  Cornerstone exclusively sells insurance products of Mid-West, which is a subsidiary of defendant United Insurance Companies, Incorporated ("United Insurance").

Cornerstone's business model employs a hierarchic-pyramidal system of sales agents and sales managers.  At the lowest level are the sales agents whose sole responsibility is selling Mid-West's insurance policies.  In ascending order, there are district sales managers, regional sales managers, area sales managers, and national sales managers.[2]  Cornerstone possesses the exclusive authority to hire or fire, promote or demote, and assign or reassign any sales agent or manager.  Cornerstone also determines the amount of commissions sales agents and managers will receive.

Plaintiffs all started work as sales agents after being required to pay an application fee, obtain an insurance license at their own expense, go through an initial training period, and sign a sales-agent contract.  Under the terms of the contract, all Plaintiffs acknowledged that they were "independent contractors" and that nothing in the contract was "intended to create an

_____

[2]  Cornerstone later changed the names from "managers" to "leaders."

employer-employee relationship between" Cornerstone, Mid-West, and Plaintiffs.  They also agreed "not to assent to or take a position contrary to [their] status as an independent contractor . . . ."

The contract provided Plaintiffs with broad discretion to "decide when, where, and [how]" to sell Mid-West's insurance policies.  Plaintiffs were responsible for all of their expenses, including all business overhead, such as transportation, phone and cell phone, rental of office space, fax machines, office supplies, and any other equipment and materials.  These costs, however, where shared among the district and regional sales managers and all of the sales agents that fell under them.  Plaintiffs were also responsible for state and federal income tax, self-employment tax, social security tax, medicare tax, unemployment tax, and workers' compensation.

Plaintiffs agreed in the contract "not to sell or solicit . . . any insurance products" from any other company.  Cornerstone determined the policies for sale, the price of the policies, and the geographical area where each agent could sell the policies.

In exchange, Plaintiffs were paid strictly on a commission basis determined by the number of insurance policies they sold.  They understood that they would receive an Internal Revenue Service form 1099 for income-tax purposes.  Plaintiffs received no benefits.  They did not accrue vacation time or sick leave, there were no retirement plans, and there was no health insurance.

3

Although Plaintiffs were primarily responsible for all business expenses under the contract, Cornerstone did pay for some of them.  Cornerstone paid for the computers in the office and the software needed to sell the insurance policies.  Also, depending on the level of production from the office, Cornerstone would pay for some of the advertising costs.  And Cornerstone paid for accounting, sales brochures, training materials, the development of insurance products, and the underwriting of their policies.

Plaintiffs also agreed under the contract to attend periodic meetings and training sessions designed to address compliance issues, regulatory matters, and new or existing insurance products.  The contract indicated that there might be other meetings and training sessions, but that attendance was not mandatory.[3]

Sales agents were eligible for promotion to district sales managers ("district managers").  All of the Plaintiffs had reached the level of district manager.  In order to accept this position, Plaintiffs were required to sign a supplemental contract to their original agent contract.  Plaintiffs acknowledged in their supplemental contract that "all provisions" in their original agent contract "shall remain in full force and effect."  Again, Plaintiffs acknowledged that they were still independent contractors and that Cornerstone did not have "the power or right to control the

---

[3] The parties dispute whether in fact attendance was mandatory at these other meetings and training sessions.

4

manner or means of the business activities" performed as district managers.

District managers' responsibilities were to recruit and train new sales agents, see that agents under them complied with the agent contract and with Cornerstone's rules, procedures and guidelines, inform Cornerstone of any violations by a sales agent, safe guard leads obtained through Cornerstone's "LEAD Program," and distribute the leads to sales agents under them. District managers were also responsible for ten percent of Cornerstone's costs in obtaining leads through their LEAD Program.[4] And district managers were required to pay regional sales managers a "management fee" that went to expenses for maintaining the office. Cornerstone provided training to district managers to teach them how to train new sales agents. The parties dispute whether this training was mandatory.

In return, district managers were not only paid commissions for insurance policies they sold, but they also received an "overwrite" commission. These overwrite commissions were commissions based on the production of the sales agents under them.

District managers were eligible for promotion to regional

---

[4] Under this program, Plaintiffs would receive the names of prospective policy holders and prospective clients from Cornerstone. This was an important program and Cornerstone invested a significant amount of time and money developing leads for its agents in the field. The cost of the program was shared among the district, regional, and area managers and Cornerstone. The district, regional, and area managers shared fifty percent of the cost and Cornerstone was responsible for the other fifty percent. But Cornerstone had the exclusive authority to decide who, if any, received the leads generated from the program.

sales manager ("regional managers").  Plaintiffs Mark Croucher, Terrence Johanesen, Jeff Gessner, Scott Roughen, David Young, Norman Campbell, Donald Klein, Bob Howell, Joseph Hopkins, and Steve Woodhead reached the level of regional manager.  Similar to district managers, these Plaintiffs were required to sign a supplemental contract that reiterated their status as independent contractors, and affirmed that all of the provisions in their original sales-agent contracts were to remain in full force and effect.

Regional managers' responsibilities are to recruit new sales agents, train and motivate sales agents and district managers, and manage the sales agents and district managers under them.  Regional managers are responsible for placing advertisements for new agents and maintaining an office where sales agents can be trained and where new recruits can respond to ads and interview for a position. At times, and depending on the level of productivity, Cornerstone would pay for a portion of these costs.  And regional managers were responsible for twenty percent of Cornerstone's costs in obtaining leads through their LEAD Program.

Regional managers spend most of their time recruiting and interviewing new agents and managing rather then selling insurance policies.  Although regional managers would conduct the interviews, only Cornerstone had the authority to hire the person.  The regional manager could only make a recommendation.  And all hires

contracted directly with Cornerstone—none were the employee of the regional manager.  While typically Cornerstone would place a newly recruited sales agent under the regional manager responsible for acquiring the new recruit, that was not always the case, and, at all times, Cornerstone retained the exclusive authority not only to assign or reassign sales agents to other regions, but to reassign district managers as well.  Most of the regional managers' income comes from the overwrite commissions based on the productivity of the sales agents and district managers under them.

Regional managers were eligible for promotion to area sales managers ("area managers").  Only one plaintiff, Joseph Hopkins, reached the level of area manager.  Still, he was required to sign a supplemental contract that reiterated his status as an independent contractor, and affirmed that all of the provisions in his original sales-agent contract were to remain in full force and effect.

An area manager's primary responsibility was to supervise and motivate the district and regional managers.  The area manager primarily manages the lower management, but may also assist with recruiting and training.  Area managers do not have a specific office; instead, area managers are required to travel and visit with the various regional managers under them.  Area managers bear all of their travel expenses, and are responsible for twenty percent of the costs associated with the LEADS Program.

7

None of the plaintiffs currently work for Cornerstone.  When they filed their instant lawsuit claiming damages under the FLSA, Cornerstone terminated most of their contracts[5] and withheld their commissions.  Cornerstone determined that when Plaintiffs filed their suit alleging that they were employees, Plaintiffs breached their agreement "not to take a position contrary to my status as an independent contractor."

II.  Analysis

A.  Subject-Matter Jurisdiction

Defendants' motion to dismiss or, in the alternative, for summary judgment calls upon the Court to decide whether it has subject-matter jurisdiction over this case.  Defendants argue that the determination of whether Plaintiffs are employees or independent contractors "is critical to the threshold issue of whether this Court has jurisdiction to adjudicate Plaintiffs' FLSA claims." (Defs.' Br. Supp. Mot. Dismiss at 12).

The first question the Court must decide is whether the employee/independent-contractor determination "affects federal-court subject-matter jurisdiction or, instead, delineates a substantive ingredient of a" FLSA claim.  *Arbaugh v. Y & H Corporation,* 126 S.Ct. 1235, 1238 (2006).  The determination of

---

[5] A few of the plaintiffs had already left Cornerstone before the instant suit was filed.

8

this question has consequences.   If the Court concludes that Plaintiffs' employment status is jurisdictional, a finding that Plaintiffs were independent contractors would not only require the Court to dismiss Plaintiffs' FLSA claims, but it would require the Court to dismiss their state-law claims as well.   The Court's pendant jurisdiction over Plaintiffs' state-law claims relies on the Court having original jurisdiction over their FLSA claims.  *See* 28 U.S.C. § 1367; *Exxon Mobil Corporation v. Allapattah Services,* 545 U.S. 546, 552-53 (2005).   But if the Court were to conclude that Plaintiffs' employment status is not jurisdictional, but rather, is an essential ingredient to the merits of their FLSA claims, then the Court may exercise jurisdiction over Plaintiffs' state-law claims even if the Court were to find that Plaintiffs were independent contractors and dismiss their FLSA claims.  *See Arbaugh,* 126 S.Ct. at 1244.

"Congress has broadly authorized the federal courts to exercise subject-matter jurisdiction over 'all civil actions arising under the Constitution, laws, or treaties of the United States.'" *Id.* at 1239 quoting 28 U.S.C. § 1331.   Whether a claim arises under federal law "is governed by the 'well pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Rivet v. Regions Bank,* 522 U.S. 470, 475 (1998)(internal quotations and citations

omitted).

> Before deciding that there is no jurisdiction, the District Court must look to the way the complaint is drawn to see if it is drawn so as to claim a right to recover under the Constitution and laws of the United States. For to that extent the party who brings a suit is master to decide what law he will rely upon and . . . does determine whether he will bring a 'suit arising under' the . . . [Constitution or laws] of the United States by his declaration or bill.

*Bell v. Hood,* 327 U.S. 678, 681 (1946)(internal quotations and citations omitted). A claim invoking federal-question jurisdiction may nevertheless be dismissed for want of subject-matter jurisdiction "where the alleged claim under the Constitution or federal statues clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Id.* at 682-83; *see also Steel Company v. Citizens for a Better Environment,* 523 U.S. 83, 89 (1998).

Plaintiffs' case does not fit the exception. Plaintiffs have asserted claims under the FLSA, which is federal law. Their claims are neither insubstantial nor made solely for the purposes of obtaining subject-matter jurisdiction. Therefore, the Court enjoys subject-matter jurisdiction under section 1331's broad grant of jurisdiction.

Despite this broad grant of jurisdiction over all civil actions under the Constitution, laws, and treaties of the United

States, the Supreme Court has recognized that Congress has passed statutes that contain their "own jurisdiction-conferring" provisions. *Id.* at 1240, 1245 n.11. "Congress has exercised its prerogative to restrict the subject-matter jurisdiction of federal district courts based on a wide variety of factors . . . ." *Id.* at 1245 n.11. Thus, the Court must decide whether the FLSA contains its own jurisdiction-conferring provision restricting the Court's normal exercise of jurisdiction under section 1331.

*Arbaugh* involved an action under Title VII of the 1964 Civil Rights Act, which makes it unlawful for an employer to discriminate, among other things, on the basis of sex. The Act contains its own jurisdiction-conferring provision, which reads:

> Each United States district court . . . shall have jurisdiction of actions brought under this subchapter.

42 U.S.C. § 2000e-5(f)(3). The Supreme Court explained that when Congress enacted the Civil Rights Act, section 1331 contained an amount-in-controversy jurisdictional limitation. *Arbaugh,* 126 S. Ct. at 1239. Title VII's jurisdiction-conferring provision "assured that the amount-in-controversy limitation would not impede . . . access to a federal forum." *Id.*

In the Civil Rights Act, Congress limited the definition of an "employer" to include only those having fifteen or more employees. *See* 42 U.S.C. § 2000e(b). This definition was found in a part of the act that defined thirteen terms used throughout Title VII.

11

This raised the question of "whether the numerical qualification contained in Title VII's definition of 'employer' affects federal-court subject-matter jurisdiction or, instead, delineates a substantive ingredient of a Title VII claim for relief." *Arbaugh*, 126 S. Ct. at 1238.

Arbaugh brought a case against Y & H Corporation for sexual harassment under Title VII and won a jury verdict in the amount of $40,000. After the district court entered a final judgment, the employer challenged the district court's subject-matter jurisdiction for the first time on the grounds that it had fewer than fifteen employees. Recognizing that it was "unfair and a waste of judicial resources," the district court nonetheless dismissed Arbaugh's case concluding that the fifteen-or-more-employees requirement was jurisdictional. *Id.*

The Supreme Court reversed and held that "the numerical threshold does not circumscribe federal-court subject-matter jurisdiction." *Id.* The High Court recognized the confusion:

> On the subject-matter jurisdiction/ingredient-of-claim-for-relief dichotomy, this Court and others have been less than meticulous. Subject-matter jurisdiction in federal-question cases is sometimes erroneously conflated with a plaintiff's need and ability to prove the defendant bound by the federal law asserted as the predicate for relief—a merits related determination.

*Id.* at 1242 (internal quotations and citations omitted). In an attempt to clear up the confusion, the Supreme Court articulated

the following "bright-line" rule:

> If the legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue.  See *Da Silva,* 229 F.3d at 361 ("Whether a disputed matter concerns jurisdiction or the merits (or occasionally both) is sometimes a close question.").  But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character.

*Id.* at 1244.

Applying *Arbaugh,* the United States Court of Appeals for the Fifth Circuit held that the Family Medical Leave Act ("FMLA" or "the Act") definition of an "eligible employee" is not a limit on a federal court's subject-matter jurisdiction but rather, "is an essential ingredient of an FMLA claim for relief."  *Minard v. ITC Deltacom,* 447 F.3d 352, 353 (5th Cir. 2006).  The FMLA entitles eligible employees to take up to twelve weeks of unpaid leave for any of several reasons, including a serious health condition.  *See* 29 U.S.C. § 2612(a)(1)(D).  Subject to some limited exceptions, an eligible employee is entitled to certain protections when taking leave under the Act.  *See* 29 U.S.C. § 2614.  The Act contains a specific definition for "eligible employee."  *See* 29 U.S.C. § 2611(2).

The enforcement provision of the Act makes any employer liable to any eligible employee for damages caused by violations of the Act.  *See* 29 U.S.C. § 2617.  This provision also expressly creates

a right of action and provides for federal subject-matter jurisdiction over claims for violations of the FMLA.

> An action to recover damages or equitable relief prescribed . . . may be maintained against any employer . . . in any Federal . . . court of competent jurisdiction by any one or more employees . . . similarly situated.

29 U.S.C. § 2617(a)(2).

"In light of the Supreme Court's decision in *Arbaugh,*" the Fifth Circuit concluded that "the definition section of the FMLA, which defines . . . the term 'eligible employee,' is a substantive ingredient of a plaintiff's claim for relief, not a jurisdictional limitation." *Minard,* 447 F.3d at 356. The Court reasoned that the "eligible employee" requirements "appears in the definitions section, separate from the jurisdictional section, and does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts." *Id.* Applying the Supreme Court's bright-line rule, the Fifth Circuit concluded that Congress had chosen not to treat the eligible-employee requirements as jurisdictional. *Id.* at 357. In light of *Arbaugh* and *Minard,* the Court concludes that the employee/independent-contractor determination does not affect the Court's subject-matter jurisdiction, but instead, delineates a "substantive ingredient" of Plaintiffs' FLSA claims.

The FLSA provides employees with certain rights to wages and overtime wages and prohibits any retaliation against an employee

who attempts to enforce the rights under the statute. *See* 29 U.S.C. §§ 207(a)(1), 215(a)(1). The FLSA contains a very broad definition of employee in a separate part of the statute called "definitions," which contain about twenty-four other definitions to be applied throughout the statute. *See* 29 U.S.C. § 203. In another separate part of the FLSA is a provision for "penalties" for its violation. *See* 29 U.S.C. § 216. Under section 216(b)—titled: *Damages; right of action; attorney's fees and costs; termination of right of action*—the statute provides:

> An action to recover . . . may be maintained
> against any employer . . . in any Federal . .
> . court of competent jurisdiction by any one
> or more employees similarly situated.

This language is nearly identical to the language used in the FMLA's enforcement provision. *See* 29 U.S.C. § 2617(a)(2) ("An action to recover damages . . . may be maintained against any employer . . . in any Federal . . . court of competent jurisdiction by any one or more employees . . . similarly situated."). And like Title VII in *Arbaugh,* and the FMLA in *Minard,* the FLSA'a defini-tions section is "separate from the jurisdictional section and does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts." *Minard,* 447 F.3d at 356; *Arbaugh,* 126 S. Ct. at 1245. Therefore, the Court concludes that it is compelled to follow *Arbaugh* and *Minard* and hold that the determination of whether Plaintiffs are employees or independent contractors does not affect federal-court subject-matter jurisdic-

15

tion but, instead, "delineates a substantive ingredient" of Plaintiffs' FLSA claims for relief. *Arbaugh,* 126 S. Ct. at 1238.


B.    Summary Judgment

1.    Summary-Judgment Standard

Summary judgment is proper when the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  An issue is considered "genuine" if "it is real and substantial as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489 (5th Cir. 2001).  Facts are considered "material" if they "might affect the outcome of the suit under governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To determine whether there are any genuine issues of material fact, the Court must first consult the applicable substantive law to ascertain what factual issues are material. *Lavespere v. Niagra Mach. & Tool Works*, 910 F.2d 167, 178 (5th Cir. 1990).  Next, the Court must review the evidence on those issues, viewing the facts in the light most favorable to the nonmoving party.  *Id.; Newell v. Oxford Mgmt. Inc.*, 912 F.2d 793, 795 (5th Cir. 1990).

In making its determination on the motion, the Court must look at the full record including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits.  *See* FED. R.

CIV. P. 56(c); *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988).

Rule 56, however, "does not impose on the district court a duty to

sift through the record in search of evidence to support" a party's

motion for, or opposition to, summary judgment. *Skotak v. Tenneco*

*Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). Thus,

parties should "identify specific evidence in the record, and . .

. articulate" precisely how that evidence supports their claims.

*Forsyth v. Barr*, 19 F.3d 1527, 1536 (5th Cir. 1994). Further, the

Court's function is not to weigh the evidence and determine the

truth of the matter but to determine whether there is a genuine

issue for trial. *See Anderson*, 477 U.S. at 249.

To prevail on a motion for summary judgment, a moving party

may submit evidence that negates a material element of the

respondent's claim or defense or show that there is no evidence to

support an essential element of the respondent's claim or defense.

*See Celotex Corp v. Catrett*, 477 U.S. 317, 322-24 (1986). To

negate a material element of the respondent's claim or defense, a

moving party must negate an element that would affect the outcome

of the action. *See Anderson*, 477 U.S. at 247. If the moving party

alleges that there is no evidence to support an essential element

of the respondent's claim or defense, the moving party need not

produce evidence showing the absence of a genuine issue of fact on

that essential element. Rather, the moving party need only show

that the respondent, who bears the burden of proof, has adduced no

17

evidence to support an essential element of his case.  *See Celotex*, 477 U.S. at 325; *Teply v. Mobil Oil Corp.*, 859 F.2d 375, 379 (5th Cir. 1988).

When the moving party has carried its summary-judgment burden, the respondent must go beyond the pleadings and produce evidence that sets forth specific facts showing there is a genuine issue for trial.  *Celotex Corp.*, 477 U.S. at 324; *see also* FED. R. CIV. P. 56(e).  This burden is not satisfied by creating some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.  *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.  *See Anderson*, 477 U.S. at 249-50.

2.   Judicial Estoppel

Prior to filing this suit, plaintiffs Norm Campbell and Chris Fox were sued (separately from one another) in the state courts of Texas and California, respectively.  Defendants produced a page from a deposition of Campbell taken by the plaintiff in his case. Apparently, in response to the question: "So you consider Mid-West, then, your company?" Campbell replied: "I am an independent contractor."  (Defs.' App. Supp. Mot. Dismiss at 396.)  Defendants have not produced any other evidence regarding this lawsuit against

18

Campbell.

According to Campbell, he was "named individually in a lawsuit brought by an insured against Cornerstone." (Pls.' Resp. Mot. Dismiss at 19.) The plaintiff "was a sales agent for another [United Insurance]-owned insurer," and was filing suit alleging that Mid-West had apparently failed to pay some medical bills he claimed were covered under his policy. *Id.; see also* (Pls.' App. Resp. Mot. Dismiss at 893-97.) Campbell explains that Defendants had paid for his defense and had "paid to settle the claims." *Id.*

Fox and Defendants were sued in the county court of Bexar County, Texas, for, among other things, sexual harassment in violation of Texas Labor Code § 21.001, *et seq.* (commonly referred to as the "Texas Commission on Humans Rights Act"). In his answer[6] to the plaintiff's allegations of sexual harassment Fox asserted,

> Plaintiff is an improper party and lacks standing to sue Defendant Fox under Texas labor Code § 21.001 *et seq.* Defendant Fox asserts that there is no employer/employee relationship between Plaintiff and Fox pursuant to Texas Labor Code § 21.001 *et seq.* Defendant Fox further asserts there is no employer/employee relationship between Fox and the other co-defendants to invoke liability pursuant to Texas labor Code § 21.001 *et seq.*

(Defs.' App. Supp. Mot. Dismiss at 404.) In response to claims of constructive discharge, negligent retention and supervision, respondeat superior, vice principal, ratification, and joint and

---

[6] Fox's filed his own separate answer from the co-defendants.

19

several liability, Fox asserted that "Plaintiff was not an employee as defined by Texas Labor Code § 21.001 *et seq.*," that he "was not an employee as defined by Texas Labor Code § 21.001 *et seq.*," and that "Plaintiff was not an employee of Defendant Fox and . . . Fox was not an employee of the other co-defendants." *Id.* at 404-08. And in his answer, Fox asserted that "all of the individuals identified in Plaintiff's Original Petition were independent contractors and not employees, co-workers, or supervisors of Defendant Fox." *Id.*

Defendants produced certain pages of the plaintiff's deposition of Fox. In the deposition, Fox answers, "I'm a[n] . . . independent contractor with them" in response to the question: "What's your relationship with Cornerstone America?" *Id.* at 399. Fox also stated, "I'm in complete control of my own business. I don't have to answer to anybody, and there's no greater feeling than that." *Id.* at 398a.

According to Fox, his statement that he is in complete control of his business was in response to an inquiry made by the plaintiff's counsel as to "what he would tell potential sales agents he was trying to recruit or train to motivate them . . . ." (Pls.' Resp. Mot. Dismiss at 12.) Fox explains:

> This is not testimony . . . that he was in complete control over his own work as a manager for Cornerstone, and there is significant evidence in this case, including declarations of numerous managers, to establish that a district sales manager was not in control of

> how own business and did have to answer to
> supervising managers on a regular basis.

*Id.*  But according to his deposition, Fox was speaking as a district manager: "As a district, yeah." (Defs.' App. Mot. Dismiss at 398a.)  He offers no explanation regarding the lawsuit or the position he took in his answer to the various claims against him.

The Supreme Court has recognized the uniform application of judicial estoppel as "an equitable doctrine invoked by a court at its discretion."  *Maine v. New Hampshire,* 532 U.S. 742, 749 (2001)(internal quotations and citations omitted).  In its most basic form, the doctrine "prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding."  *Id.*

The High Court observed three factors that may inform a court's decision on whether to invoke the doctrine:

> First, a party's later position must be
> "clearly inconsistent" with its earlier posi-
> tion. . . . Second, courts regularly inquire
> whether the party has succeeded in persuading
> a court to accept that party's earlier posi-
> tion, so that judicial acceptance of an incon-
> sistent position in a later proceeding would
> create "the perception that either the first
> or the second court was misled." . . . A third
> consideration is whether the party seeking to
> assert an inconsistent position would derive
> an unfair advantage or impose an unfair detri-
> ment on the opposing party if not estopped.

*Id.* 750-51.  But the Court stressed that these factors "do not establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel."  *Id.* at 751.

21

Courts are free to consider additional or different factors that "may inform the doctrine's application in specific factual contexts." *Id.* The Court emphasized that its decision to use the above-listed factors in the *New Hampshire* case was because

> we simply observe that the [enumerated] fac-
> tors above firmly tip the balance of equities
> in favor of barring New Hampshire's present
> complaint.

*Id.* In other words, the Supreme Court availed itself of the factors that best fit the circumstances of the *New Hampshire* case.

The Fifth Circuit has recognized judicial estoppel as "'a common-law doctrine by which a party who has assumed one position in his pleadings may be estopped from assuming an inconsistent position.'" *In the Matter of: Coastal Plains, Inc.,* 179 F.3d 197, 205 (5th Cir. 1999)(quoting *Brandon v. Interfirst Corp.,* 858 F.2d 266, 268 (5th Cir. 1988)). The doctrine is designed "to protect the integrity of the judicial process" by prohibiting parties from deliberately changing positions according to the exigencies of the moment. *Id.* "Because the doctrine is intended to protect the judicial system, *rather than the litigants,* detrimental reliance by the opponent of the party against whom the doctrine is applied is not necessary." *Id.* (emphasis in original).

Generally, two requirements must be met before judicial estoppel can be invoked. "First, it must be shown that the position of the party to be estopped is clearly inconsistent with its previous one; and [second,] that party must have convinced the

22

court to accept that previous position." *Hall v. GE Plastic Pacific PTE PTD., et al.,* 327 F.3d 391, 396 (5th Cir. 2003) (internal quotations and citations omitted). The doctrine applies to more than just sworn statements made by a party in a previous litigation. *Id.* A party "who has assumed one position in his pleadings may be estopped from assuming an inconsistent position" in subsequent pleadings. *Brandon,* 858 F.2d at 268.

The purpose of the prior-acceptance requirement is to minimize the danger of contradicting a court's determination made in reliance on a party's prior position. *Id.* at 398.

> The previous court's acceptance of a party's argument could be either as a preliminary matter or as part of a final disposition. . . . **The judicial acceptance requirement does not mean that the party against whom the judicial estoppel doctrine is to be invoked must have prevailed on the merits**. . . . Our cases suggest that doctrine may be applied whenever a party makes an argument with the explicit intent to induce the district court's reliance. (Emphasis added.)

*Id.* (internal quotations and citations omitted).

Turning to Fox, the Court concludes that he should be judicially estopped from asserting his status as that of an employee of Defendants. In a previous litigation involving claims of sexual harassment under Texas Labor Code § 21.001, Fox asserted in his answer that he was an independent contractor, that he and the plaintiff in that case did not enjoy an employee-employer relationship and that he and Defendants did not enjoy an employee-

employer relationship.  Under oath, Fox testified that he was an independent contractor and emphasized that, when he recruited potential agents for Defendants, he would pitch to them the benefits of being an independent contractor.  That position is clearly inconsistent with the position he is currently taking in this litigation.  Now Fox is asserting that he was an employee of Defendants and that they did have an employee-employer relation-ship.  And he is trying to distance himself from his testimony by claiming that he was speaking in the context of a sales agent and not a district manager.  But both his answer to the state court and his deposition clearly show otherwise.

It is clear that Fox intended to induce the state court's reliance on his argument that he was an independent contractor and that none of the parties enjoyed any kind of employee-employer relationship.  The law is clear in Texas, an "individual must be an employee to receive" the protections of the TCHRA.  *Thompson v. City of Austin,* 979 S.W.2d 676, 681 n.5 (Tex.App.—Austin [3rd Dist.] 1998).  Fox's intent was to induce the state court to accept his argument as a complete defense to most of the plaintiff's claims.  The Court will not allow Fox to shield himself from liability by swearing to one court that he was an independent contractor and then, before this Court, inflict liability on another by insisting that he is not an independent contractor after all, but is, instead, a sword-wielding employee.  This is espe-

24

cially to be prevented given that here Fox is taking his sword after his fellow shield-bearers in the previous case—his independent-contractor co-defendants.  This is nothing more than Fox's "'playing fast and loose with the courts to suit the exigencies of [his] self-interest.'"  *Coastal Plains,* 179 F.3d at 205 (quoting *Brandon,* 858 F.2d at 268).  This is precisely the situation the judicial-estoppel doctrine was designed to prevent.

As to Campbell, the Court concludes that judicial estoppel is not appropriate.  While Campbell did testify under oath that he was an independent contractor, Defendants have failed to produce any evidence that Campbell asserted that position as a defense to any claims lodged against him in the California state court.  Due to this insufficient evidence, it is not clear to the Court whether his assertion that he is an independent contractor was pivotal to his defense or insignificant.  And it is not clear to the Court whether Campbell intended to induce reliance on the part of the California state court.  Without more, the Court cannot conclude that Campbell was attempting to play fast and loose with the courts to suit his self-interest.  *Id*.  Although Campbell is asserting a contradictory position to the one he took under oath, that bears on his credibility, should it be an issue, rather than triggering a judicial estoppel.

Finally, Defendants bring the Court's attention to numerous income-tax returns filed by Plaintiffs where they indicated, under

25

penalty of perjury, that they were self-employed.  But the evidence also shows that Defendants gave all of the Plaintiffs IRS form 1099s for income-tax purposes.  This is far too coercive to allow an inference by this Court of an estopping inconsistency on Plaintiffs' part.  It's all too likely that Plaintiffs felt compelled to state to the IRS that they were self-employed because they received 1099 forms instead of W-2s.  Also, though Defendants produce numerous applications where Plaintiffs either indicated they were self-employed or inserted the names of their own businesses, there is also evidence that Plaintiffs initially indicated that they were employees but that Defendants changed the applications and that, on subsequent applications, Plaintiffs merely acquiesced.

Judicial estoppel is aimed at protecting the integrity of the courts and preventing the perversion of the judicial process to serve self-interest.  It is not a doctrine designed to protect the interests of government agencies and private business.  For that, they can avail themselves of other equitable doctrines, such as promissory and equitable estoppel.  And, like Campbell above, Plaintiffs' inconsistent statements are more relevant to their credibility, than to judicial estoppel.  Thus, the Court declines to judicially estop the other Plaintiffs.

3.    Whether Plaintiffs are Independent Contractors or Employees

Under the FLSA, an employee is defined as "any individual employed by an employer." 29 U.S.C. § 203(e)(1).[7] The statute defines "employer" as "including any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U.S.C. § 203(d). And to "employ," as defined by the statute, "includes to suffer or permit to work." 29 U.S.C. § 203(g).

The employer-employee relationship under the FLSA is broadly defined. *See Rutherford Food Corporation v. McComb,* 331 U.S. 722, 728-29 (1947). In fact, the Supreme Court has recognized that the statute's definition of "employee" has "been given the broadest definition that has ever been included in any one act." *United States v. Rosenwasser,* 323 U.S. 360, 363 n.3 (1945); *see also Nationwide Mutual Insurance v. Darden,* 503 U.S. 318, 326 (1992)(noting the "striking breadth" of the expansive definition of employee under the FLSA).

The determination of employment status under the FLSA is guided by the economic reality of the relationship. *Herman v. Express Sixty-Minutes Delivery Services, Inc.,* 161 F.3d 299, 303 (5th Cir. 1998). The Court's focus is on whether, as a matter of economic reality, a person is economically dependent upon the

---

[7] The statute delineates certain exceptions to this broad definition, none of which apply to this case. *See* 29 U.S.C. § 203(e)(2),(3),(4).

27

employer to which he renders his services. *Id.* "In other words, [the Court's] task is to determine whether the individual is, as a matter of economic reality, in business for himself or herself." *Id.*

The Court generally considers five factors in making this determination: (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and alleged employer; (3) the degree to which the worker's opportunity for profit and loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and, (5) the permanency of the relationship. *Id.* But the Court has also inquired into whether the alleged employer has the power to hire and fire employees, supervises and controls employee work schedules or conditions of employment, determines the rate and method of payment, and maintains employment records. *Thrash v. Graves,* 909 F.2d 1549, 1553 (5th Cir. 1990).

"No single factor is determinative." *Herman,* 161 F.3d at 303. Further,

> these factors are not exhaustive, nor can they be applied mechanically to arrive at a final determination of employee status. Rather, they must always be aimed at an assessment of the economic dependence of the putative employees, the touchstone for this totality of circumstances test.

*Brock v. Mr. W Fireworks, Inc.,* 814 F.2d 1042, 1043 (5th Cir. 1987). Facile labels and subjective factors are not controlling,

and they are only relevant to the extent that they mirror the economic reality of the relationship. *Id.* at 1044. The dominant factor that informs the Court's decision is economic dependence. *Id.*

> The five tests are aids—tools to be used to gauge the degree of dependence of alleged employees on the business with which they are connected. It is *dependence* that indicates employee status. Each test must be applied with that ultimate notion in mind. More importantly, the final and determinative question must be whether the total of the testing establishes the personnel are so dependent upon the business with which they are connected that they come within the protection of the FLSA or are sufficiently independent to lie outside its ambit. (Emphasis in original.)

*Id.*

Findings as to the factors "are plainly and simply" questions of fact. *Id.* The "ultimate conclusion" as to "employee status . . . is a legal conclusion based on factual inferences drawn from historical facts." *Id.* at 1045.

a.  Degree of Control

Defendants argue that Plaintiffs[8] were independent contractors because they "controlled their own work, including when, where, and the manner and means under which they conducted business activi-

---

[8]  Because the Court has determined that plaintiff Fox is judicially estopped from asserting his status as an employee, for purposes of this section, the Court's use of "Plaintiffs" excludes Fox.

ties." (Defs.' Resp. Mot. Part. Summ. J. at 9-10.)  For support, Defendants point to the contracts and supplemental contracts Plaintiffs signed that expressly provided for Plaintiffs' complete control over when, where, and how to conduct their business activities.  *Id.* at 10.  Defendants contend that Plaintiffs' work went largely unsupervised, that Plaintiffs were given wide latitude in how they accomplished their jobs, and that Plaintiffs supplied the tools and equipment necessary to do their jobs.  But in the end, Defendants' chief argument is that Plaintiffs set their own work schedules.  (Defs.' Mem. Supp. Mot. Dismiss at 19-20; Defs.' Resp. Mot. Part. Summ. J. at 15-16.)

While Plaintiffs may have had some flexibility in the hours, days, and places they worked, the economic reality is that Defendants controlled the significant aspects of the business.  As pointed out above, the critical focus is whether Plaintiffs were independently in business for themselves, and the degree of control must be viewed through that lens.  Although Plaintiffs' control over their work schedule is a factor the Court can consider, it is by no means a controlling factor.  This is especially true today since many employees' work is unsupervised; and many employees work flexible hours or even work from home.

Defendants do not dispute that they controlled what insurance policies Plaintiffs were allowed to sell.  It was Defendants who decided what policies they would offer and underwrite.  Plaintiffs

were prohibited from selling any policies from another company, regardless of whether or not it was a competing policy. And Defendants do not dispute that they controlled the price of the insurance policies.

Further, Defendants do not deny that they controlled the substantive content of any advertising. Before Plaintiffs could place any advertisement, whether print media or otherwise, Plaintiffs had to submit the advertisement to Defendants for approval. Defendants explain that they "imposed this requirement in the contract . . . in order to make sure that insurance advertisements complied with state laws and regulations." (Defs.' Mem. Mot. Dismiss at 20.) But the reason for Defendants' control is irrelevant. What is relevant is the degree of control Defendants exerted over Plaintiffs and whether that control made Plaintiffs dependent on Defendants or whether Plaintiffs were, as a matter of economic reality, in business for themselves.

Defendants also do not dispute that they controlled the hiring or firing, assignment or reassignment, promotion or demotion, and commission rates of the insurance sales agents and managers. It is undisputed that Plaintiffs' chief income was derived from overwrite commissions (set by Defendants) they received as a percentage of the total production of the sales agents under them. The more sales agents that were under Plaintiffs and the more productive those agents were, the more money Plaintiffs received in the form

31

of overwrite commissions.

Defendants organized their workforce into a pyramidal structure. At the bottom are the sales agents who earn commissions off of the policies they sell. The next level are the district managers who earn overwrite commissions based on a percentage of the total production of all the sales agents under them. The next level are the regional managers who have district managers under them, each of whom have their own sales agents under them. Regional managers also earn overwrite commissions based on a percentage of the total production of all the sales agents that were under the district managers that were under them. The same is true for the next level, the area managers, and the final level, the national manager. The only source of income is the production of the sales agents.

Although Plaintiffs were responsible for recruiting new agents, interviewing prospective agents, training agents, motivating them to sell Defendants' policies, and maintaining an office for the agents to work out of, at best, Plaintiffs could only offer a recommendation as to whether a person should be hired as an agent or fired. Defendants ultimately decided whether to hire the person, whether to fire the person, and although normally the new recruit was placed under the manager responsible for the recruit, Defendants ultimately decided the placement of that new recruit. Moreover, Defendants controlled whom to promote and whom to demote

and, at any time, Defendants could reassign sales agents and managers to other regions or areas.  Plaintiffs had no control as to whom was promoted under them and Plaintiffs had no control as to whom was assigned under them.

Another critical aspect of the business was Defendants' LEAD Program.  Defendants invested a considerable amount of time and money in developing leads for its agents to sell Defendants' insurance policies.  But Defendants do not deny that they controlled the Program and that they decided who received leads and the amount of leads they received.

Finally, the parties do not dispute that Plaintiffs were required to attend certain meetings and training sessions that addressed Defendants' products and compliance issues.  The parties do dispute, however, whether other meetings, such as "turn-in" meetings and other training sessions were mandatory or optional.  But even assuming these "other" meetings and training sessions were not mandatory, the Court finds that Defendants still controlled the most significant aspects of Plaintiffs' businesses, making them economically dependent on Defendants.

The critical issue in examining the factor of control is whether Plaintiffs were independently in business for themselves or economically dependent on Defendants for their success.  The Court is unable to perceive how any individual logically can be said to be in business for himself when he has no control over what product

33

or service the business offers; no control over the price of that product or service; no control over the advertising of that product or service; and no control over hiring or firing, compensation rate, promotion or demotion, and assignment or reassignment of individuals directly responsible for the business's bottom line. Defendants argue that Plaintiffs were free to hire any employees under them, and are quick to point out that one of the plaintiffs had hired her son to help keep track of her phone messages and appointments.  But this is insignificant when viewed through the lens of economic dependence.  Plaintiff's son, who helped her with scheduling and messages, did not contribute to the production of the business—the bottom line.  The most important assets—the sales agents and managers, whose productivity dictated the income for the business; the policies offered; the price of the policies; and the advertising—were all controlled by Defendants.  Plaintiffs were completely dependent on Defendants to supply them with the workforce, to supply them with the policies available for sale, and to approve the advertisements needed to push the policies and recruit new agents.  They were also completely dependent on Defendants to set the price of the policies and set their rates of compensation.  The fact that Plaintiffs controlled their work schedules and performed their jobs under little or no supervision simply pales in comparison to the amount of control and direction Defendants exerted over every major aspect of the business.

34

"Control is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity." *Pilgrim,* 527 F.2d at 1312-13.   Thus, the Court concludes that the degree-of-control factor weighs heavily in favor of Plaintiffs' being employees.


b.   Relative Investment of Plaintiffs and Defendants

     Defendants argue that "Plaintiffs' relative investments were significant." (Defs.' Mem. Supp. Mot. Dismiss at 22.)   Plaintiffs were required to lease their own office space, purchase their own office equipment (phone, computer, office supplies, facsimile machine, etc.) procure and maintain their own licenses, pay for any assistants they hired such as office aids or secretaries, and pay for any advertising costs.

     Plaintiffs counter, "There is no question that the amount of money Defendants invested into their business far outweigh[s] the investments made by any of these individual Plaintiffs." (Pls.' Mem. Resp. Mot. Dismiss at 40.)   Plaintiffs point out that Defendants admit they invested significantly into their businesses. Defendants are large companies "with an infrastructure designed to underwrite, administer, and pay claims of the insurance products sold by Plaintiffs." (Defs.' Mem. Supp. Mot. Dismiss at 22.)   In fact, Defendants invest a significant amount into corporate offices,   personnel,   accounting   department,   human   resources,

printing brochures, printing the contracts Plaintiffs and other agents sign, creating and paying for training sessions for agents, and creating and developing the insurance policies available for sale.  When compared to Plaintiffs, there is no question that Defendants invest far more into the insurance sales business than any one of the Plaintiffs.

Plaintiffs' "relative investment must be compared with the investment of [Defendants] in order to determine the degree of economic dependence." *Mr. W Fireworks, Inc.,* 814 F.2d at 1052.  A comparison of Plaintiffs' investment to that of Defendants establishes that "the overwhelming majority of the [capital risk]" is borne by Defendants.  Plaintiffs are economically dependent on Defendants' investments in the business, especially since Plaintiffs have no control over the development of the insurance products available for sale.  Thus, the Court concludes that the relative-investment factor also weighs heavily in favor of employee status for Plaintiffs.

c.  Opportunity for Profit and Loss

Defendants argue, "It is undisputed that Plaintiffs completely controlled their own opportunities for profit and loss." (Defs.' Mem. Supp. Mot. Dismiss at 22.)  Defendants claim this is undisputed because "Plaintiffs admitted as much by confessing that they could increase profits through hustling harder at recruiting new

sales people and creating new sales." *Id.* No doubt that's true, but that was the only way Plaintiffs could affect how much they earned. The remainder of the control resided with Defendants.

As discussed above, Plaintiffs' income came from overwrite commissions based on a percentage of the total productivity of the sales agents under them. While Plaintiffs could obviously work harder to generate more sales and recruit more sales agents, so could an employee who works for a retail clothing store selling suits, or the retail manager who recruits more sales associates. But it was Defendants who controlled the products sold and the price of those products. It was Defendants who determined whether a new recruit would be hired and where sales agents would be placed. It was Defendants who controlled the rate of compensation, the advertising, and the geographical location and reach of each Plaintiff. All have a direct impact on each Plaintiff's ability to capture profits and avoid losses.

Defendants are correct that the harder Plaintiffs "hustled" the more money they made. "For the most part, [Plaintiffs'] only 'expenditures' from which the[y] . . . obtain a return is [on] their own labor . . . . Such returns are more properly classified as wages, not profits." *Mr. W Fireworks, Inc.,* 814 F.2d at 1050-51 (internal quotations and citations omitted). Thus, the Court concludes that Plaintiffs are far more akin "to wage earners toiling for a living, than to independent entrepreneurs seeking a

return on their risky capital investments." *Id.*

d.  Skill and Initiative

Defendants argue that "Plaintiffs' success depended entirely on their own skill and initiative in selling insurance products." (Defs. Mem. Supp. Mot. Dismiss at 23.) While Defendants admit that they may have provided training to Plaintiffs to assist them in being successful, they argue that it was Plaintiffs' application of those skills that mattered.  Defendants maintain that it was Plaintiffs who, through their own efforts, became "insurance professionals" and obtained the necessary licenses to sell insurance.  *Id.*  Defendants argue that the fact that Plaintiffs were required to pass an insurance exam and obtain a license "weighs in favor of finding an independent contractor relation-ship." *Id.*

Plaintiffs counter by downplaying the acumen needed to obtain a license to sell insurance.  "[I]t is debatable how skillful one must be to obtain such a license . . . ." (Pls.' Mem. Resp. Mot. Dismiss at 41.)  And they argue that "there is no special skill involved in management." *Id.*

The amount of "skill" required to obtain an insurance license is irrelevant.  Whether Plaintiffs were required to obtain a license is just another factor and, at that, one that is ambiva-lent.  An insurance company can hire insurance agents as employees

and still require them to obtain licenses.  Most employee brokers for companies like Morgan Stanley and Merrill Lynch are required to have licenses to trade securities on behalf of the companies' clients.  Thus, the fact that Plaintiffs were required to obtain licenses does little to inform the Court as to whether Plaintiffs were independently in business for themselves or were Defendants' employees.

The record establishes that the most important skill is Plaintiffs' ability to sell the business to new recruits and to motivate new recruits to sell numerous policies.  This "skill" is no different from any other manager engaged as an employee.  Skill and initiative that evidence independence cannot include routine duties or responsibilities normally expected of an employee in the same position.  Rather, skill and initiative should demonstrate independent entrepreneurism.  "'All major components open to initiative—advertising, pricing, and most importantly the choice of . . . [policies] with which to deal—are controlled by [Defendants].'"  *Mr. W Fireworks, Inc.,* 814 F.2d at 1053 (quoting *Usery v. Pilgrim Equipment Company, Inc.,* 527 F.2d 1308, 1314-15 (5th Cir. 1976)).  Plaintiffs' skills and initiative in obtaining an insurance license and increasing the productivity of the sales agents below them "'are valuable.  But many successful employees need these same abilities and perform similar tasks.  The bottom line in this enterprise is the business acumen and investment

39

contributed by . . . [Defendants].'" *Id.* Thus, the Court concludes that the skill-and-initiative factor weighs heavily in favor of employee status for the Plaintiffs.

e.  Permanency of the Relationship

Defendants argue that "there is no question that the permanency-of-the-relationship factor weighs in favor of finding independent contractor status" because the employment contract provided that "either party may terminate the contract without cause" at any time. (Defs.' Mem. Supp. Mot. Dismiss at 24.) But it's not what the parties "could have done that counts, but as a matter of economic reality what they actually do that is dispositive." *Mr. W Fireworks, Inc.,* 814 F.2d at 1047.

Here, the majority of the Plaintiffs were managers for Defendants for years. Mark Mann was a manager for seven years, Sherri Lewis for six, Andrew Bowman for four, Donald Klein for two and one-half, and Joseph Hopkins for thirteen. The record shows that no Plaintiff stayed with Defendants for less than one year. And Defendants admit, once a sales agent is promoted to manager, the agent would stay with the business "for a significant period of time." (App. Supp. Pls.' Mot. Partial Summ. J. at 33.)

This long-term relationship with Defendants indicates Plaintiffs' dependence on Defendants. Not one of Plaintiffs is capable of terminating his relationship with Defendants and taking

40

his business to another insurance agency.  Plaintiffs have no business to take; they have nothing to transfer but their own labor.  It makes sense that agents promoted to management would tend to stay with Defendants for long periods of time.  After laboring hard to recruit new sales agents and establishing a constant flow of overwrite commissions from that hard work, one would be reluctant to just throw that away.  Thus, the Court concludes that the permanency factor also weighs heavily in favor of Plaintiffs' employee status.  *Cf. Pilgrim,* 527 F.2d at 1314 ("The contract involved here is for a 1 year duration and is routinely renewed. . . . Not a single operator is shown to be capable of terminating relations with Pilgrim and taking her organization to another laundry.  The operators have nothing to transfer but their own labor.").

f.  Other Factors

Defendants argue that Plaintiffs were paid solely on a commission basis; that their earnings were reported on IRS form 1099s; and that Plaintiffs had signed contracts, filed tax returns, and submitted various applications asserting that they were independent contractors and self employed.  None of these factors, however, do anything more than inform the Court as to the subjective belief of the parties as to Plaintiffs' status.  None objectively illustrates whether, as a matter of economic reality,

41

Plaintiffs were independently in business for themselves.  If the Court were to allow these criteria to determine that Plaintiffs were independent contractors, Defendants would be able to escape the labor laws while at the same time reap the benefits of an employer-employee relationship.  "Subjective beliefs cannot transmogrify objective economic realities.  A person's subjective opinion that he is a businessman rather than an employee does not change his status." *Mr. W Fireworks, Inc.,* 814 F.2d at 1049; *see also Pilgrim,* 527 F.2d at 1315 ("We reject both the declaration in the lease agreement that the operators are 'independent contrac-tors' and the uncontradicted testimony that the operators believed they were, in fact, in business for themselves as controlling FLSA employee status.  Neither contractual recitations nor subjective intent can mandate the outcome of these cases.").

Further, Defendants argue that most of the Plaintiffs have been able to continue to work as insurance agents for other insurance companies.  But the Court does see how that fact shows Plaintiffs were not dependent on Defendants' business for which they rendered their services—especially in light of the fact that they had no business to take with them to their new insurance employer.  On the contrary, this factor tends to shows the economic dependence of Plaintiffs.

Many of the plaintiffs were involuntarily terminated for bringing this lawsuit.  Plaintiffs did not want to forsake their

hard-earned gains by leaving voluntarily.  This clearly illustrates their economic dependence on Defendants, who owned the fruits of their labor.  Plaintiffs were not capable of doing business elsewhere; instead, they had to find employment elsewhere.

Finally, Defendants argue that none of the Plaintiffs received health benefits, sick time, or vacation days.  Again, this has limited impact on the economic reality of the relationship between Plaintiffs and Defendants.  Regardless of Plaintiffs' benefits, they still had no control over the most fundamental aspects of the business.  The fact that Plaintiffs agreed to terms of their compensation that excluded any benefits "does not show independence.  Rather it shows . . . [the alleged employer] chose to place this added burden on its [employees]." *Mr. W Firworks, Inc.,* 814 F.2d at 1050.

In deciding whether Plaintiffs are employees under the FLSA, the Fifth Circuit has said

> the ultimate criteria are to be found in the purposes of the Act . . . .
> The Act is intended to protect those whose livelihood is dependent upon finding employment in the business of others.  It is directed toward those who themselves are least able in good times to make provisions for their needs when old age and unemployment may cut their earnings off . . . to those who, as a matter of economic reality, are dependent upon the business to which they render service.

*Id.* at 1315 (internal quotations and citations omitted).  After weighing all of the factors above and remaining mindful "that

43

economic dependence is not an independent variable with a life of its own—it can only be determined in conjunction with consideration of the economic reality of all the relevant circumstances," the Court concludes that Plaintiffs were employees of Defendants.  All of the relevant circumstances disclose that Plaintiffs did not exercise any meaningful control over the insurance business they allegedly ran.  Instead, Defendants retained control over major variables that determined Plaintiffs' ability to make a profit, held them captive to the business, and made them dependent on Defendants for their success.

4.  Retaliation

Defendants argue that Plaintiffs' retaliation claim under the FLSA must fail because they are not employees under the statute and thus have no standing to bring a retaliation claim.  The Court has already determined that all of the Plaintiffs except Fox are employees.  Thus, Defendants' argument must fail as to those Plaintiffs.

But as to Fox, because he is judicially estopped from asserting his status as that of being an employee of Defendants, the Court concludes that his retaliation claim under the FLSA must also fail.  Under the FLSA,

> it shall be unlawful for any person . . . to
> discharge or in any other manner discriminate
> **against any employee** because such employee has
> filed any complaint or instituted or caused to

be instituted any proceeding under or related
to this chapter . . . . (Emphasis added.)

29 U.S.C. § 215(a)(3).  By the express terms of the statute it
applies to any person who retaliates against any employee who seeks
to enforce the protections under the FLSA.  While the perpetrator
of the retaliation can be any person and is not limited to just an
employer, the victim of the retaliation must be an employee.  Fox
has been judicially estopped from asserting his status as an
employee of Defendants.  Therefore, just like Fox cannot recover
under the FLSA for unpaid overtime wages, he cannot recover for
retaliation.  "Statutory words mean nothing unless they distinguish
one situation from another; line-drawing is the business of
language."  *Contract Courier Services v. Department of Transportation,* 924 F.2d 112, 114 (7th Cir. 1991)(Easterbrook, J.).  Under
the maxim of statutory interpretation—*expressio unius est exclusio
alterius*[9]—when the statute names a certain group as coming under
its protection, other unnamed groups are excluded from its reach.


5.   Breach of Contract

     Defendants argue that Plaintiffs' state-law claim for breach
of contract should be dismissed because the Court lacks subject-
matter jurisdiction over Plaintiffs' FLSA claims.  The Court has
already determined that Plaintiffs' status under the FLSA does not

---

     [9]  Translated: "the expression of one thing is the exclusion of another."

affect the Court's subject-matter jurisdiction, and the Court has already determined that all Plaintiffs, with the exception of Fox, were employees of Defendants under the FLSA.

Alternatively, Defendants argue that Plaintiffs' breach-of-contract claim against defendant United Insurance should be dismissed because "Plaintiffs cannot produce evidence establishing a contractual relationship with defendant [United Insurance]." (Defs.' Mem. Supp. Mot. Dismiss at 29.)   United Insurance, Defendants claim, "is not an insurance company and has no sales agents." *Id.*   Thus, Defendants argue, Plaintiffs "cannot identify a contract with [United Insurance]." *Id.*   Plaintiffs have not responded to this argument.

Under Texas law, the essential elements of a breach-of-contract claim are: (1) the existence of a valid contract; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and, (4) the breach damaged the plaintiff. *Frost National Bank v. Burge,* 29 S.W.3d 580, 593 (Tex. App.—Houston [14th Dist.] 2000, no pet.).   Subsidiary corporations and parent corporations "are separate and distinct 'persons' as a matter of law and the separate entity of corporations will be observed by the courts even where one company may dominate or control, or even treat another company as a mere department, instrumentality, or agency." *National Plan Administrators, Inc. v. National Health Insurance Company,* 150 S.W.3d 718, 744 (Tex. App.—Austin [3rd

46

Dist.] 2004, pet. granted).  "Generally, a court will not disregard the corporate fiction and hold a corporation liable for the obligations of its subsidiaries except where it appears the corporate entity of the subsidiary is being used as a sham to perpetrate a fraud, to avoid liability, to avoid the effect of a statute, or in other exceptional circumstances." *Lucas v. Texas Industries, Inc.*, 696 S.W.2d 372, 374 (Tex. 1984).  In a suit for breach of contract, the plaintiff bears the burden "of justifying recovery against the parent when he willingly contracted with the subsidiary." *Gentry v. Credit Plan Corporation,* 528 S.W.2d 571, 573 (Tex. 1975).

The contract Plaintiffs signed is titled: *Cornerstone America, A Division of Mid-West National Life Insurance Company of Tennessee Agent Contract*.  The first paragraph in the contract states,

> This document constitutes a Cornerstone America Agent Contract and becomes effective upon the date accepted, approved, and executed by a duly authorized official of Cornerstone America, a division of Mid-West National Life Insurance Company of Tennessee . . . .

Nowhere in the contract is United Insurance mentioned.

Not only have Plaintiffs wholly failed to respond to Defendants argument regarding United Insurance, they have failed to produce any evidence to justify their recovery against United Insurance for breach of contract when they willingly entered into a contract with Cornerstone America and Mid-West.  Thus, the Court concludes that Plaintiffs' breach-of-contract claim against

47

defendant United Insurance should be dismissed.

Finally, Defendants argue that they had a right to terminate the contract because Plaintiffs breached the contract. Defendants point to a provision in the contract that states, "By executing this Contract, I agree not to assent to or take a position contrary to my status as an Independent Contractor pursuant to this Contract . . . ." Defendants argue, "Plaintiffs breached the contract by the initiation of this suit where they expressly take a position contrary to their status as independent contractors." (Defs. Mem. Supp. Mot. Dismiss at 30.)

The FLSA makes it "unlawful for any person . . . to discharge or in any manner discriminate against any employee" because the employee instituted an action under the statute. 29 U.S.C. § 215(a). Defendants freely admit that it was Plaintiffs' initiation of this case asserting claims as employees under the FLSA that was the impetus behind their termination of the contract and their subsequent refusal to pay Plaintiffs any overwrite commissions earned while employed by Defendants. Defendants argue, however, that

> Plaintiffs erroneously assert that the clause
> in the contract in which they assent not to
> take a position contrary to their status as an
> independent contractor is void as a matter of
> public policy. Parties may contract as they
> see fit, as long as their agreement does not
> violate the law or public policy . . . .
> Plaintiffs freely signed the contract . . .,
> and they cannot articulate why the contract is
> either illegal or contrary to the public's

48

interest . . . .

(Defs. Mem. Supp. Mot. Dismiss at 30.)

In determining whether a provision in a contract violates public policy, the Court looks to see if the provision has a tendency "to injure the public good." *Ranger Insurance Company v. Ward,* 107 S.W.3d 820, 827 Tex. App.—Texarkana 2003, pet. denied). Generally, a provision violates public policy "if it is illegal or inconsistent with or contrary to the best interests of the public." *Id.* Public policy can be embodied in the constitution, statutes, and the decisions of courts. *Id.*

The Supreme Court has stated that the principal congressional purpose behind the FLSA

> was to protect all covered workers from sub-standard wages and oppressive working hours, "labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers."

*Barrentine et al., v. Arkansas-Best Freight System, Inc., et al.,* 450 U.S. 728, 739 (1981)(quoting 29 U.S.C. § 202(a)). The Court found that "the FLSA was designed to give specific minimum protections to *individual* workers" and to guarantee that every employee received "a fair days pay for a fair days work." *Id.* (internal quotations and citations omitted)(emphasis in original).

The FLSA gives individual employees the right to enforce the statutory scheme and grants to them broad access to the courts to accomplish this. 29 U.S.C. § 216(b); *see Barrentine,* 450 U.S. at

49

740. The statute contains no exhaustion requirements, no proce-
dural barriers, and no other forum for enforcement of the rights
conferred under the statute. *See Barrentine,* 450 U.S. at 740.
Because of the broad right of access to the courts and the
important nature of the rights protected by the statute, the
Supreme Court has held that the rights conferred by Congress to
employees are nonwaivable. *Id.* And accordingly, the Supreme Court
has held that

> FLSA rights cannot be abridged by contract or
> otherwise waived because this would nullify
> the purposes of the statute and thwart the
> legislative policies it was designed to effec-
> tuate.

*Id.*

Based on the forgoing, the Court concludes that the contrac-
tual provision prohibiting Plaintiffs from taking a position
contrary to their status as an independent contractor, <u>as applied</u>,
violates public policy. While on its face, the contract provision
relied on by Defendants does not violate public policy, its
<u>application</u> in this circumstance does. Defendants' decision to
invoke that contractual provision as grounds to terminate the
contract was solely in response to Plaintiffs' initiation of this
suit to enforce their substantive rights under the FLSA. Defen-
dants' conduct falls squarely within the anti-retaliation provision
in the statute and is precisely the type of conduct Congress sought
to prohibit. To enforce that provision under the circumstances of

this case would place the contract in a position of precedence over the congressionally enacted FLSA.  This is beyond the power of the Court to do.

III. Conclusion

For the reasons stated above, the Court PARTIALLY GRANTS Plaintiffs' motion for partial summary judgment (doc. #84).  The Court holds that all of the Plaintiffs, with the exception of Chris Fox, are employees for purposes of their FLSA claims.  Defendants' motion to dismiss or in the alternative for summary judgment is PARTIALLY GRANTED AND PARTIALLY DENIED.  The Court holds that Fox is judicially estopped from asserting his status as an employee under the FLSA.  Consequently, all of Fox's FLSA claims are DISMISSED WITH PREJUDICE.

Further, the Court holds that Plaintiffs have failed to present any evidence that defendant United Insurance was a party to the contract or otherwise should be held liable for the contractual obligations of its subsidiaries.  Consequently, Plaintiffs' breach of contract claim against defendant United Insurance is DISMISSED WITH PREJUDICE.

Further, the Court holds that the provision in the parties' contract addressing Plaintiffs' agreement not to take a position contrary to their status as independent contractors violates public policy as applied under the circumstances of this case.  The

51

evidence conclusively establishes that there was a contract and there was performance under the contract (in fact the parties do not dispute this).   Because Defendants asseverate that it was Plaintiffs' filing of a compliant under the FLSA that was the impetus behind their termination of the contract, the Court concludes that Defendants breached the contract.

Finally, because Plaintiffs have stated that they are abandoning their claims of fraud and conversion, those claims are hereby DISMISSED WITH PREJUDICE.   In all other aspects, Defendants' motion is DENIED.

SIGNED March 30, 2007

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE