**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| JOSEPH HOPKINS, et al., | § | CIVIL ACTION NO. 4:05-CV-332-Y |
| | § | |
| vs. | § | <u>Consolidated with Civil Actions:</u> |
| | § | 4:05-CV-333-Y; 4:05-CV-334-Y |
| CORNERSTONE AMERICA, et al. | § | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF RESPONSE TO DEFENDANTS'**
**MOTION FOR PARTIAL SUMMARY JUDGMENT (OUTSIDE SALES**
**EXEMPTION)**

TABLE OF CONTENTS

*Page*

TABLE OF CONTENTS ................................................................................... i

LIST OF AUTHORITIES ................................................................................ ii

SUMMARY RESPONSE ................................................................................. 1

STATEMENT OF FACTS ............................................................................... 2

I.   The Primary Duty of District Managers – As Previously
     Defined by the Court and Defendants ................................................. 2

II.  Specific Issues and Objections to Defendants' Statement of Facts.................. 4

III. Summary Judgment Evidence Regarding Each Plaintiffs' Role
     as a District Manager ........................................................................... 6

A.   Andrew Bowman ............................................................................. 6
B.   Norman Campbell ............................................................................ 7
C.   Jeffrey Gessner................................................................................. 8
D.   Bob Howell....................................................................................... 8
E.   Donnie Klein ................................................................................... 9
F.   Mark Mann ..................................................................................... 10
G.   David Young.................................................................................... 11
H.   Eric Dodson .................................................................................... 12
I.   Carl France ..................................................................................... 13
J.   Clyde Robert Jetter, Jr...................................................................... 14
K.   Glenn Marshall ............................................................................... 15
L.   William Matles ................................................................................ 16
M.   Jose Quintero .................................................................................. 17
N.   Audra Thompson ............................................................................. 18
O.   Michael Vogler ................................................................................ 19
P.   Stephen Wike .................................................................................. 20

ARGUMENTS & AUTHORITIES ................................................................. 21

I.   Standard of Review .......................................................................... 21

II.  The Outside Sales Exemption – Generally ......................................... 22

III. Pre-August 23, 2004 Outside Sales Exemption – The 20% Test ...................... 25

IV.  Post-August 23, 2004 Outside Sales Exemption –
     The Primary Duty Test ....................................................................... 26

PRAYER......................................................................................................... 31

LIST OF AUTHORITIES

## CASES

*Arnold v. Ben Kanowsky, Inc.*,
    361 U.S. 388, 80 S.Ct. 453 (1960) ................................................................ 22

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 106 S.Ct. 2548 (1986) ............................................................ 21

*Cobb v. Finest Foods, Inc.*,
    755 F.2d 1148 (5th Cir. 1985) ...................................................................... 22

*Dalheim v. KDFW-TV*,
    918 F.2d 1220 (5th Cir. 1990) ...................................................................... 27

*Edwards v. Alta Colleges, Inc.*,
    2005 WL 578333 (W.D. Tex. Jan. 28, 2005) ............................................ 22, 23-24

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574, 587, 106 S.Ct. 1348 (1986) ................................................ 21

*Moore v. Willis Indep. Sch. Dist.*,
    233 F.3d 871 (5th Cir. 2000) ...................................................................... 22

## STATUTES, RULES, AND OTHER AUTHORITIES

29 C.F.R. §541.5 ............................................................................................ 25

29 C.F.R. §541.500 ........................................................................................ 26-27

29 C.F.R. §541.700 ........................................................................................ 27, 30

29 U.S.C. §213 .............................................................................................. 22

### SUMMARY RESPONSE

Defendants seek summary judgment on the FLSA overtime claims of 16 Plaintiffs (including original and collective action Plaintiffs) based on the contention that they are exempt from receiving overtime pay because they were engaged in outside sales. Because the Department of Labor changed the test for determining the applicability of the outside sales exemption on August 23, 2004, there are two tests that apply to these Plaintiffs.

For work performed before August 23, 2004, the issue is whether the district managers spent more than 20% of their time performing tasks other than outside sales. This is a pure mathematical calculation.  If the district managers performed more than 20% of their time on something other than their own outside sales, they are not subject to the outside sales exemption and Defendants' motion for summary judgment must be denied as to these Plaintiffs.  There is evidence the district managers who performed work before August 23, 2004, spent significantly more than 20% of their time on things that were not related to their own sales.

For work performed on and after August 23, 2004, the issue is whether the primary duty of the district managers was work performed in relation to the managers' own outside sales.  This primary duty test is not a simple mathematical calculation. Instead, it requires the Court to consider the totality of the circumstances to determine whether the district managers' primary duty was outside sales.  Cornerstone promoted these Plaintiffs to the role of district manager for the specific purpose of training and managing the sales agents under them in the hierarchical structure.  Before labeling this position as District Manager, Cornerstone called these employees Sales Trainers. Although the primary duty of the sales agents is outside sales, the primary duty of

district managers is to train and manage the sales agents. Cornerstone's own documents admit the primary duty of its district managers is not outside sales: "As a Sales Trainer/District Manager, you have a variety of roles, however, your primary role is that of role model, mentor and coach for the agents on your team." The summary judgment evidence at least raises genuine issues of material fact that the primary duty of these Plaintiffs was not outside sales, but rather, was to train and mentor the sales agents.

STATEMENT OF FACTS

## I. The Primary Duty of District Managers – As Previously Defined by the Court and Defendants

In its Order Partially Granting Motion for Interlocutory Appeal, this Court explained part of its reasoning in finding the managers at Cornerstone were employees and not independent contractors. In the following analysis, the Court has already addressed one the issues raised by Defendants' Motion for Summary Judgment – i.e., whether the primary role of the District Managers is outside sales:

> The Court's decision was not based on the fact that Plaintiffs were insurance agents. Instead, it was based, in part, on the fact that Plaintiffs were employed as managers at varying levels of management. And as managers, **Plaintiffs' primary job no longer involved actually selling Defendants' insurance policies**, but, rather, involved managing insurance agents and managers under them.

[Doc. #123, p. 8 (emphasis added)]

According to Defendants' own Cornerstone University seminar materials, the primary duty of a District Manager is not outside sales.

> As a Sales Trainer/District Manager, you have a variety of roles, however, **your primary role is that of role model, mentor and coach for the agents**

**on your team**. Your focus should be on helping your team members achieve their dreams.

[App. 538 (emphasis added)]

According to Cornerstone's "Sales Trainer Addendum":

YOU acknowledge and accept this position of confidence and trust and **agree and accept the duties and responsibilities** as follows: a) **contract and train SUBMEMBERS** in generally accepted methods of insurance solicitation at Your expense in accordance with materials and guidelines established through CMA; b) comply with and **oversee the compliance of SUBMEMBERS** to the CONTRACT, as well as rules and procedures of CMA; c) safeguard LEADS provided YOU by CMA, **distribute them to and retrieve the from Your SUBMEMBERS**; d) follow the rules and procedures of those persons designated at HIERARCHY levels above you; e) **review applications submitted by SUBMEMBERS for completeness and accuracy**; f) acknowledge and accept the fiduciary responsibility of receiving in trust and distributing ADVANCES made by CMA to YOU and Your SUBMEMBERS.

[App. 48 (emphasis added)]

According to Cornerstone's "District Sales Leader Supplement to Agent Contract

with Cornerstone America":

I acknowledge and accept this position of confidence and trust and **agree and accept the duties and responsibilities** as follows: a) **contract and train Agents** in generally accepted methods of insurance solicitation at My expense in accordance with materials and guidelines available from CORNERSTONE AMERICA; b) comply with and **oversee the compliance of Agents** in my Hierarchy with the CORNERSTONE AMERICA Agent Contract and any supplements thereto, as well as rules and procedures of CORNERSTONE AMERICA; c) safeguard LEADS provided me by CORNERSTONE AMERICA; **distribute and retrieve Leads to and from Agents** in my Hierarchy; d) safeguard all confidential and proprietary information of CORNERSTONE AMERICA and/or MID-WEST in My possession and return same to the office of CORNERSTONE AMERICA within forty-eight (48) hours of the termination of My Contract with CORNERSTONE AMERICA; and e) **review insurance applications submitted by Agents for completeness and accuracy**.

[App. 420 (emphasis added)]

## II.    Specific Issues and Objections to Defendants' Statement of Facts

In its section entitled "Undisputed Facts Pertaining to Individual DSL Plaintiffs," Defendants make several statements that are clearly disputed by the evidence and constitute improper inferences construed in favor of the movant Defendants and against the non-movant Plaintiffs contrary to the proper summary judgment standard of review.  Plaintiffs do not agree the Defendants' statements of fact are undisputed, but rather, that there are genuine issues of fact that prevent the Court from granting the requested summary judgment.  Below are three examples of some of the statements made by Defendants that are either clearly disputed or constitute improper inferences. Further, Section III of Plaintiffs' Statement of Facts set forth additional summary judgment evidence that precludes a finding that Defendants have met their burden of proof in this matter.

Defendants make several statements regarding hours they have calculated and what percentage of time that would translate to for specific Plaintiffs.  These numbers often are contradictory to clear testimony from the Plaintiffs.  For example, Defendants state the following with regard to Clyde Robert Jetter, Jr.:

> In total, Jetter accounted for approximately 65 to 70 working hours per week, in which he spent 50 to 55 hours doing personal production or tasks incidental to his personal production, and 15 hours a week on non-sales activities such as training new agents and attending the weekly turn-in meeting.  In other words, according to Jetter's testimony regarding his weekly schedule, Jetter spent 77% to 79% of his time on personal production or tasks incidental to personal production.

[Defendants' Memo., p. 21]  Not only do Defendants not explain how they arrived at their calculation that Mr. Jetter conducted only 15 hour a week in non-sales activities, the statement that he spent 77% to 79% of his time on personal production is directly

contradictory to Mr. Jetter's testimony that he spent 30% of his time on personal production.

> Q:    As a percentage of time spent as a DSL doing personal production, what would you estimate your – what percentage of time were you doing personal production?
>
> A:    Thirty percent, maybe.
>
> Q:    Thirty percent?
>
> A:    Maybe 30 percent.
>
> Q:    The rest of the time you we doing DSL stuff?
>
> A:    Administrative stuff.

[App. 324-325]  Earlier in the deposition, Mr. Jetter testified he had to "attend two or three days' worth of meetings per week."  [App. 308]  The statement made by Defendants in their Memorandum simply is not consistent with the testimony of Mr. Jetter that the majority of his time was spent on things other than personal production.

Defendants also often make statements about certain work being incidental to the Plaintiffs' own sales when the record does not make such a connection.  For example, with regard to Andrew Bowman, Defendants make the following statement: "On Mondays, he checked paperwork that was incidental to his sales, which took an average of two to three hours."  [Defendants' Memo., p. 8 (emphasis added)]  But in Mr. Bowman's deposition testimony on which Defendants' rely, he testified that the paperwork was that of his sales agents.  "And everybody on my team, I had to go over their business and make sure that they didn't forget anything. . . .  That usually took between two and three hours."  [App. 14 (emphasis added).  There is no basis for

Defendants' statement to the Court and it necessarily raises questions about Defendants' calculations with regard to all Plaintiffs.

Finally, Defendants often make inferences that are improper in the summary judgment context. For example, with regard to Glenn Marshall, Defendants state: "Marshall testified that the only mandatory meeting he had to attend lasted less than five hours a week, suggesting he spent the remaining 55 to 60 hours per week working on his personal production or engaging in tasks incidental to his personal production, such as filling out paperwork to close his sales." [Defendants' Memo., p. 23 (emphasis added)] Defendants are asking the Court to infer the only time a District Manager spends on anything other than his own outside sales is during mandatory meetings. This is an improper inference for purposes of summary judgment and contrary to the evidence as to the other time Mr. Marshall spent training and managing his agents outside of mandatory meetings. Further, Defendants' inference is inconsistent with Mr. Marshall's testimony that twice a week he spent a half to a full day going with agents on their appointments, that he would listen to his agents make their phone calls and critique them, and that he would arrive early to the mandatory meeting and go over the agents' paperwork and leads, all of which were not his personal production. [App. 366, 369-372]

## III.   Summary Judgment Evidence Regarding Each Plaintiff's Role as a District Manager

## A.   Andrew Bowman

Andrew Bowman was a District Manager from 2001 to 2004. [App. 558] All of his overtime work as a District Manager, therefore, is subject to the 20% test. Mr. Bowman spent more than 20% of his time performing work other than his own sales and those tasks incidental to or in conjunction with his personal sales. [App. 558]

Mr. Bowman worked 60 to 70 hours each week as a District Manager for Cornerstone. [App. 558] He has identified scheduled, weekly meetings that accounted for 19 to 23.5 hours of his time each week. [App. 7-8, 12-23, 30, 34, 38-39, 558-559] Consequently, even without considering the additional time Mr. Bowman spent each week training and managing his sales agent on an unscheduled basis and without considering the 10 to 20 hours he spent each week going with his agents on their sales appointments, he spent more than 20% of his time on matters that did not relate to his outside sales. [App. 7, 36-37, 558] Further, Mr. Bowman's sales themselves were not all completed outside the office. In fact, approximately 20% of his sales meetings were conducted at his office. [App. 40, 558]

## B.    Norman Campbell

Norman Campbell was a District Manager for Cornerstone from October 2000, until he was promoted to a Regional Manager in December 2003. [App. 44-45, 561] All of his work as a District Manager, therefore, is governed by the 20% test. He spent significantly more than 20% of his time on matters unrelated to his own personal sales. [App. 561]

Mr. Campbell worked 70 to 80 hours each week as a District Manager for Cornerstone. [App. 561] He has identified scheduled or planned meetings and activities that accounted for 28.5 to 30 hours of his time each week. [App. 561] In addition to these scheduled duties, Mr. Campbell spent numerous additional hours performing agent training and management, so that most of his time as a District Manager was not spent on his own personal sales. [App. 55-64, 561-562] He also spent 3 to 7 hours each week on his agents' sales calls for which he did not share credit for a successful sell. [App. 562]

C.    **Jeffrey Gessner**

Jeffrey Gessner was a District Manager for Cornerstone from March 2001, until January 1, 2003, when he was promoted to a Regional Manager.  [App. 107, 110, 564] All of his time as a District Manager, therefore, is governed by the 20% test.  He spent significantly more than 20% of his time on matters that were not related to his own sales.  [App. 564]

Mr. Gessner averaged 60 to 65 hours each week as a District Manager for Cornerstone.  [App. 134-135, 564]  He spent only 16 to 21 hours each week on his own sales and matters incidental to his own sales.  [App. 115-117, 564]  The remainder of his time was spent recruiting, training, and managing sales agents.  [App. 121-122, 124-125, 128, 130-132, 564]  Mr. Gessner identified 27.5 to 28.5 hours of his time each week that was spent on scheduled tasks that were not related to his own sales.  [App. 564]  After considering these scheduled tasks along with the various other unscheduled responsibilities he performed that were unrelated to his own sales, Mr. Gessner spent the majority of his time on matters other than his outside sales.  [App. 132, 564]

D.    **Bob Howell**

Bob Howell was a District Manager from August 2003 until January 2004, when he was made a Regional Manager.  He stepped down from the Regional Manager position in February 2004 and worked as a District Manager again until May 2004.  [App. 139, 566]  All of Mr. Howell's overtime work at issue in this matter, therefore, is governed by the 20% test.  He spent much more than 20% of his time on matters that were not related to his personal production.  [App. 566]

Mr. Howell worked an average of 60 hours each week as a District Manager for Cornerstone.  [App. 159, 566]  He has identified 15.5 to 16 hours each week that were

spent on scheduled meetings.  [App. 566]  Mr. Howell also spent numerous hours each week training agents, including listening to and critiquing their phone calls, giving tips in sales presentation techniques, and generally mentoring sales agents, that were not scheduled and were not conducted in connection with his own sales.  [App. 140-141, 566]  He also spent about 4.5 hours each week with agents on their sales calls (for which the agent, not Mr. Howell, would receive credit) and spent about 3 hours each week with his agents in the neighboring businesses teaching them to get sales leads and allowing them to keep any leads obtained.  [App. 165-166, 169-170, 566]  But even without considering this unscheduled time he spent on matters unrelated to his sales, Mr. Howell spent more than 20% of his time on scheduled matters that did not relate to his outside sales.

E.    **Donnie Klein**

Donnie Klein was a District Manager from April 2002 until November 2002, when he left Cornerstone.  [App. 177-182, 569]   Mr. Klein was recruited by Cornerstone's upper management to come back and work as a Regional Manager in its experimental corporate office, so he came back in the middle of 2003 and worked as a District Manager for a couple of months before he became the Regional Manager at Cornerstone's experimental corporate office.  [App. 177-182, 569]  All of Mr. Klein's time as a District Manager is governed by the 20% test.  He spent much more than 20% of his time on matters other than his personal production.  [App. 569]

Mr. Klein worked 60 to 65 hours each week as a District Manager.  [App. 569] He has specified 16 to 19 hours spent each week on scheduled tasks that were not related to his personal sales.  [App. 187-211, 569]  He was also required to attend special weekend events (3 all-day training sessions and manager meetings) that would take

place once a month.  [App. 211, 569]  In addition to these scheduled matters, Mr. Klein estimated that he spent at least 18 hours a week on phone calls and ad hoc meetings with his agents, going over appointments, answering questions about the applications, helping them with the licensing process, discussing sales techniques, and various other issues that were not related to and did not enhance his own sales.  [App. 213, 569-570] Consequently, most of Mr. Klein's time as a District Manager was spent on matters other than his own sales.

F.    **Mark Mann**

Mark Mann was a District Manager from May 1999 to August 2005.  [App. 222, 597]  Although most of his time as a District Manager is governed by the 20% test, the last year of his work is governed by the "primary duty" test.  Mr. Mann testified that he spent considerably more than 20% of his time on tasks other than his outside sales and that his primary duty as a District Manager was, "to train rookie agents so they could get into the field and make money for Cornerstone."  [App. 597]

Mr. Mann worked an average of 58 to 61 hours each week as a District Manager for Cornerstone.  [App. 239, 597]  He has identified 18 hours of time he spent each week on scheduled matters that were not for his own sales.  [App. 597]  In addition to these scheduled matters, Mr. Mann spent a significant amount of additional time recruiting, training, and mentoring the sales agents under him.  [App. 227, 239, 597]  He had up to 75 sales agents assigned under him in the Cornerstone hierarchy.  [App. 226, 597]  Even looking only at the scheduled matters, Mr. Mann spent much more than 20% of his time as a District Manager on tasks that did not relate to or further his personal sales.

Mr. Mann's primary duty was not outside sales, but training new agents.  [App. 597-598]  He explained that the hierarchy system at Cornerstone is designed so that the

primary duty of a sales agent is to sell, but the primary duty of a district manager is to train the sales agents to they can go in the field and sell products for Cornerstone. [App. 598]  Because there is significant turnover in sales agents, there is a constant need to have a manager responsible for training these agents so they can be productive members of the team.  [App. 598]

Defendants imply that because Mr. Mann was working outside his house or the office he must have been engaged in his own personal production.  But Mr. Mann explained that when he was in the field he was training new agents between his personal appointments.  [App. 598]  He would usually take a sales agent with him for an entire day to be present during his sales presentations.  But before and after the sales presentations, Mr. Mann would teach the sales agents sales techniques, such as visualization skills and why he presented in a certain order, how to overcome customer objections, and how to close a sale.  [App. 598]  He would ask the agents to watch his presentation and be ready with any questions they might have so that after the call he could answer those questions.  [App. 598]  Mr. Mann stated that it was more difficult for him to make a sale when he had agents with him, but that he had to have them there as part of his field training.  [App. 245, 598]  Consequently, even though Mr. Mann might have been outside the office, he was spending a significant portion of his time training new agents in a way that did not further his own sales.

## G.    David Young

David Young was a District Manager from April 2000 until he was promoted to a Regional Manager in October 2002.  [App. 250-252]  All of Mr. Young's overtime, therefore, is subject to the 20% test.  Mr. Young spent significantly more than 20% of his time on matters that were not related to his own sales.  [App. 258, 267, 270-286]

Mr. Young worked 60 to 70 hours each week as a District Manager for Cornerstone.  [App. 261]  Mr. Young spent 10 hours a week on the phone with his agents coaching and training them.  [App. 279]  He would lead weekly sales meetings for agents that would take 2.25 to 2.5 hours.  [App. 279-280]  He would facilitate initial training sessions for new agents twice a month that would last from 1 to 3 days.  [App. 282-283]  He would have Friday turn-in meetings that lasted 1.5 hours.  [App. 281-282]  It would take him 1.5 hours each week to pass out leads for his agents.  [App. 284]  Mr. Young was also responsible for recruiting new agents and would make 100 calls and send 200 emails each week in recruiting efforts.  [App. 270-272]  He would attend a 2-hour group recruiting meeting every other week, and would conduct 1.5 hours of one-on-one interviews three times a week.  [App. 273, 275]  Mr. Young would also handle a significant amount of paperwork, including sales contracts, applications, reports, number crunching, keeping track of agents' appointments and sales, managing resumes (which alone took 1 hour each week), managing leads, and reviewing agents' contracts. [App. 283-286]  Based on his deposition testimony, Mr. Young identified 21.75 to 22 hours of work he conducted each week that was not related to his personal sales and identified numerous other meetings and activities for which he did not provide an amount of time.  [App. 258, 267, 270-286]  This was much more than 20% of his time as a District Manager.

**H.    Eric Dodson**

Eric Dodson was a District Manager from April 2005 to June 2007.  [App. 290, 572]  All of his time as a District Manager is, therefore, governed by the primary duty test.  Although almost half of Mr. Dodson's 60 hours each week were spent on personal production, he described his primary duty as a District Manager, "was to assume

responsibility for sales agents, training, mentoring, and spending time with them so they would become successful sales agents." [App. 291-292, 572]

Mr. Dodson kept in constant contact with his 12 to 15 sales agents on the phone and in face-to-face meetings. [App. 291-293, 572] He had formal training sessions with his agents as well as gave them general advice, helped them fill out their applications, answered questions about the insurance products they were selling, and generally mentored them to be successful sales agents. [App. 572] Mr. Dodson even went out into the field with his agents at least 6 times a week on his agents' sales appointments to help train them in the field, even though he did not receive any credit for these sales and made no more money than if he had not gone on the call. [App. 572] He did this to observe their sales techniques and provide feedback to assist them in being better salespersons. [App. 572] In explaining why training and mentoring sales agents was his primary duty he stated: "my Regional Sales Leader and Cornerstone relied on my ability to manage, train, and mentor the sales agents for the success of the hierarchy and the company." [App. 572]

I.    **Carl France**

Carl France was a District Manager from September 2003 until May 2005, when he moved from Washington to Idaho, and again from July 2005 to July 2006. [App. 334-339, 576] Although part of his time as a District Manager is governed by the 20% test, the last two years of his work is governed by the "primary duty" test. Mr. France testified that he spent more than 20% of his time on tasks other than his outside sales and that his primary duty as a District Manager was, "to manage and train the sales agents under me." [App. 340-341, 576]

Mr. France worked an average of 55 to 60 hours each week as a District Manager. [App. 340, 576]  He identified 12 hours of time he would average each week based on standing meetings (including his standing weekly meetings and his standing monthly meeting in Seattle).  [App. 348-356, 576]  But he performed numerous managerial tasks in addition to these standing meetings.  [App. 576]  Mr. France estimates that he spent in excess of 30 hours each week training and recruiting agents in a manner that was not related to his own personal sales.  [App. 576]

Mr. France explained that even though almost half of his time was spent on personal production, his primary duty as a District Manager was not selling policies. When he was a sales agent, his primary duty was selling policies, but once he became a District Manager his "role changed dramatically."  Mr. France described this change in his role once he became a District Manager as follows:  "I went from being a member of a team responsible from my production to being the quarterback of the team responsible for making sure the entire team of agents below me were properly trained and successful."  [App. 576]  He explained that it was his "duty to make sure the agents were trained, had leads, were successful and not being left behind.  Tending to the sales agents was my primary duty and personal production is something I did in the time I could make available."  [App. 576]

**J.      Clyde Robert Jetter, Jr.**

Clyde Robert Jetter, Jr., first signed a contract to be a District Manager for Cornerstone in February 2006 and remained a District Manager until June 2006.  [App. 574]  All of his time as a District Manager is, therefore, governed by the primary duty test.

Mr. Jetter spent about 30% of his 66 to 71 hours each week on personal production. [App. 322-325, 574] He testified his primary duty as a District Manager was to manage and train sales agents. [App. 574] He explained that once he went from being a sales agent to a District Manager his "role changed from one of selling to managing." [App. 574] He was required to be available to his agents at all hours of the day and would receive calls from agents asking questions about the insurance products and seeking advice and guidance. [App. 307-308, 574] He was required to evaluate the sales agents, assess their performance, set their goals, monitor their advertisements, and handle their complaints. [App. 327, 329, 574]

## K.    <u>Glenn Marshall</u>

Glenn Marshall first became a District Manager in September 1996 and went back to being a sales agent for a couple of months in 1997 before he was promoted again to District Manager in March 1997 and remained a district manager until he was required to leave because of Hurricane Katrina in August 2005. [App. 594] Although most of Mr. Marshall's time as a District Manager will be governed by the 20% test, the last year of his time is subject to the primary duty test.

Mr. Marshall worked 60 to 65 hours a week as a District Manager for Cornerstone. [App. 373, 594] He spent more than 20% of his time on tasks other than outside sales and matters incidental to or in conjunction with his own outside sales. [App. 594] Mr. Marshall specifically identified 16 to 16.5 hours of his time that he would spend each week on planned matters that were not related to his personal production. [App. 594] He also spent considerable time on various other matters as a District Manager that were unplanned or unscheduled and did not assist in his personal production. [App. 594]

Mr. Marshall described his primary duty as a District Manager for Cornerstone was, "managing sales agents by helping to hire and train sales agents and completing paperwork with regard to those managerial duties." [App. 595] Mr. Marshall was required, as part of his district manager responsibilities, to run an office in Jackson, Mississippi. [App. 595] He was responsible for checking the paperwork of all the agents under his Regional Manager (not just his agents). [App. 371] He was also required to spend time between his personal appointments training sales agents in the field on sales strategies and techniques. [App. 365-366, 369, 595] Mr. Marshall explained that "Cornerstone and my regional managers relied on me to make sure the sales agents were trained and producing effectively." [App. 595]

## L. William Matles

William Matles was a District Manager from October 2003 to April 2005 and again from October 2005 to April 2007. [App. 378-381, 582] Thus, while the first year of his management is governed by the 20% test, the remainder of his time is governed by the primary duty test.

Mr. Matles worked 60 to 70 hours each week as a District Manager. [App. 389, 582] He spent 20 to 30 hours each week on matters that were not incident to his own sales. [App. 395-396, 582] Consequently, he spent much more than 20% of his time on matters other than his outside sales.

Mr. Matles testified that his primary focus as a District Manager, "was to conduct field training with my sales agents to the point where all of my time on personal production was part of field training." [App. 582] During his deposition, Mr. Matles stated that he had about 40 hours each week that he could focus on his personal production. [App. 395, 582-583] But part of that time he was trying to work on his

personal production, he was actually required to spend with his sales agents. [App. 582-583] For example, when he was in the office trying to make his phone calls to set up appointments, he would often have to spend some of his time listening to his agents make phone calls and critiquing their phone style. [App. 582-583] Also, when he was out in the field trying to run appointments, sometimes he would be required to go on one of his agents' sales to watch their technique and give them training. [App. 384-385, 582-583] He spent 4 to 6 hours of his 40 hours watching and listening to his sales agents make their own sales. [App. 583] Further, he would routinely provide field training to agents between his appointments, so that when he was driving to an appointment or back from an appointment, he would be training agents. [App. 583] Taking this field training into consideration in addition to his in-house training, Mr. Matles spent more time training agents than he did on his personal sales. [App. 583] The focus of his duties as a District Manager was training, not personal sales.

**M.    Jose Quintero**

Jose Quintero was a District Manager from April 2, 2004 until March 2007. [App. 404, 406, 585] Thus, while the first five months of his management is governed by the 20% test, the remainder of his time is governed by the primary duty test.

Mr. Quintero worked an average of 57 hours each week as a District Manager. [App. 408, 505] He identified 17 to 18.5 hours each week when he conducted scheduled meetings and tasks that had nothing to do with his personal production. [App. 585] In addition to these schedules matters, Mr. Quintero spent approximately 6 hours each week with agents on their sales calls for which he did not receive credit. [App. 585] Even without considering the various times Mr. Quintero was required to attend ad hoc meeting or field calls from his sales agents that were not part of his scheduled work-

week, Mr. Quintero spent considerably more than 20% of his time on matters that were not related to his personal sales.  [App. 408-409, 586]

Mr. Quintero's regional manager was in Houston, Texas, so that Mr. Quintero was solely responsible for running his office in San Antonio, Texas.  [App. 407, 586] Mr. Quintero was required to be in the office every day, where he fulfilled all of the administrative duties, such as filling out hiring packets, checking agents' paperwork, distributing leads to his agents, ensuring his agents had brochures and applications, sending paperwork to the corporate offices, and fielding recruiting calls, as well as substantive managerial matters that did not involve his personal sales, such as interviewing recruits and in-house training of sales agents on Cornerstone's products and guidelines and sales techniques.  [App. 586]

Mr. Quintero described his primary duty as a District Manager as training new people to become sales agents.  [App. 585-586]  Although he was still required to maintain personal production, once he became a District Manager that took a secondary role to his running the San Antonio office and training sales agents.  [App. 586]

## N.    __Audra Thompson__

Audra Thompson was a District Manager from November 2003 until July 2005. [App. 429, 434, 591]  Consequently, about half of her time as a District Manager is governed by the 20% test and half is governed by the primary duty test.

Ms. Thompson worked 60 to 70 hours a week as a District Manager.  [App. 441, 591]  She spent 25 to 30 hours on personal production and 35 to 40 hours[1] on matters

---

[1]     Defendants attempt to reduce the amount of time she testified she spent doing things other than personal production.  First, they claim "[m]uch of the paperwork Thompson completed was incidental to her sales. . . ."  [Defendants' Memo., p. 27]  Although it is true Ms. Thompson's sales did have paperwork associated with them, there is no basis for inferring that "much of her paperwork" was for her own sales.  Ms. Thompson testified that the paperwork

that did not involve her own sales.  [App. 442-443, 453, 591]  Consequently, she spent considerably more than 20% of her time on matters unrelated to her own outside sales.

Ms. Thompson has testified her primary duty as a District Manager for Cornerstone was training sales agents.  [App. 430, 591-592]  She had to spend less time on personal sales than she did when she was a sales agent, because her primary function was to manage and train agents and she had to squeeze her personal production time around her primary functions.  [App. 592]

## O.   Michael Vogler

Michael Vogler was a District Manger from July 2004 until October 2005.  [App. 458-462, 579]  Consequently, his time as a District Manager is split between the 20% test and the primary duty test.

Mr. Vogler worked 54 to 67 hours each week as a District Manager.  [App. 475, 579]  Mr. Vogler identified more than 17 hours of time each week he would spend on regularly scheduled tasks that did not involve his own sales.  [App. 464-474, 579]  He had 32 agents under him, so he also spent a significant amount of unscheduled time throughout the week fielding calls from agents at all different times to help them with product information, sales techniques, filling out paperwork, and other issues that did not involve Mr. Vogler's own sales.  [App. 579]  Thus, Mr. Vogler spent much more

---

she reviewed was for all of the agents under her Regional Manager, which most logically results in an inference that most of the paperwork she was reviewing was that of the agents, not her own.  [App. 443]  Second, Defendants imply Ms. Thompson spent less than half of her time on tasks other than personal production by claiming she spent only 20-25 hours on training, recruiting, and paperwork.  [Defendants' Memo., p. 27]  But Ms. Thompson testified that only 25 to 30 of her 60 to 70 hours was spent on personal production: "Q: Of that 60 to 70 hours a week, how many hours would you estimate, or how many – what percentage of that time would you estimate was time spent on personal production?  A:  I'd say probably only about 25 to 30 hours."  [App. 442]  Consequently, Ms. Thompson testified she spent 35 to 40 hours each week on non-personal production, not the figure Defendants put in their Memorandum.

than 20% of this time each week on tasks other than his own outside sales and matters incident to those sales.

Mr. Vogler testified his primary duty as a District Manager was, "to manage and build a team of successful sales agents." [App. 579-580] Mr. Vogler stated that when he went from being a sales agent to a District Manager his "responsibilities changed dramatically." [App. 461, 463, 580] He was required to wear a coat and tie at the office to display a "corporate image." [App. 477, 580] He went from purely selling product to making sure the agents were a "successful team." [App. 580] Mr. Vogler explained his role as follows: "My role was to teach agents how to make presentations, fill out paperwork, and most importantly how to build business prospects. It was this management and team building that dictated how I spent most of my time and I was required to fit my personal sales into the gaps when I could find some time." [App. 580]

P.  **Stephen Wike**

Stephen Wike was a District Manager from March 2001 to August 2003 and again from June 2005 until November 2005. [App. 485-487, 494-497, 588] Although most of his time is governed by the 20% test, his second stent as a District Manager is subject to the primary duty test.

Mr. Wike worked 60 to 65 hours each week as a District Manager for Cornerstone. [App. 503, 588] He spent 20 to 25 hours each week on personal production, and 20% of that personal production constituted sales made at his office. [App. 500, 503-505, 588] Mr. Wike has identified 31.5 to 32.5 hours he spent each week on scheduled meetings during his first tenure as a District Manager, when he was running a satellite office. [App. 510-521, 588-589] He identified 16 to 19 hours of

scheduled meetings during his second tenure as a District Manager.  [App. 589]  In addition to these hours spent on scheduled meetings and training sessions, Mr. Wike spent additional time tending to his management duties, such as training agents in his office, preparing reports for his Regional Managers regarding his sale agents' productivity, and answering agents' questions.  [App. 589]  These duties that had nothing to do with his own personal sales took the majority of Mr. Wike's time as a District Manager, and far in excess of 20% of this weekly time.

Mr. Wike testified his primary duty as a District Manager was to train new agents, so they could begin to write business.  [App. 588-589]  Although he was required to maintain a certain level of personal production, he spent significantly less than half of his time on his own sales.  [App. 589]  He explained that the focus of his job was not on his own sales, but rather, on his role as a sales trainer and manager.  [App. 488-490, 589]

## ARGUMENTS & AUTHORITIES

### I.    Standard of Review

The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the "pleadings, depositions, answers to interrogatories, and affidavits, if any," that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986).  To determine whether summary judgment is appropriate, the record presented is viewed in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348 (1986).  The Court must review all of the evidence in the record, but make no

determinations of credibility or weigh any evidence, disregard all evidence favorable to the moving party that the jury is not required to believe, and give credence to the evidence favoring the non-moving party as well as uncontradicted and unimpeached evidence that supports the moving party. *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000).

"The district court's determination as to whether an employee is exempt under the [FLSA] is primarily a question of fact." *Cobb v. Finest Foods, Inc.*, 755 F.2d 1148, 1150 (5th Cir. 1985). When an employer asserts an FLSA exemption, it bears the burden of establishing it is entitled to the benefits of the exemption. *Edwards v. Alta Colleges, Inc.*, 2005 WL 578333, *6 (W.D. Tex. Jan. 28, 2005). Moreover, when analyzing the applicability of the outside sales exemption, the Court should heed the mandate of the United State Supreme Court that, "**exemptions are to be narrowly construed against the employers** seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S.Ct. 453 (1960) (emphasis added).

## II.    The Outside Sales Exemption – Generally

Defendants are requesting this Court find that as a matter of law all of Cornerstone's district managers are exempt from the FLSA's wage and hour requirements because they are outside salesmen. 29 U.S.C. §213(a)(1). As discussed below, the Department of Labor modified the standard by which one determines whether an employee falls within the outside sales exemption as of August 23, 2004. Specifically, the standard changed from a pure mathematical calculation of whether the employee spent at least 80% of his time on outside sales to whether the employee's primary duty was outside sales. Because some of these Plaintiffs were district managers

for Cornerstone before those modifications, some after the modification, and some during both periods, each Plaintiff's status must be determined in light of when he or she was employed as a district manager. Although the differences in the standards or tests that apply to the various district managers might require the Court to address the employees on an individualized basis, there are common issues to the status of these employees because they were all employed by Cornerstone to perform essentially the same duties as district managers.

Much of Defendants' arguments in support of their request for summary judgment are based on the role these Plaintiffs fulfilled when they were initially hired by Cornerstone as sales agents. Defendants continually refer to what the Plaintiffs understood their role to be when they were brought on to sell insurance and that they were required to be licensed. But Plaintiffs are not claiming they were employees for purposes of the FLSA when they were hired as sales agents; rather, once they were promoted to district manager their role changed dramatically. There is no question that even after they were promoted into management all district managers, regional managers, and area managers were required to maintain their licenses to sell insurance and were still under contract with Cornerstone as sales agents. The issue that is before the Court (which is similar to the issue that was before the Court when it held the managers were employees and not independent contractors) is the distinction between the duties of a sales agent and those of a manager.

The district court in the Western District of Texas addressed a similar issue in *Edwards v. Alta Colleges, Inc., supra*. The issue in *Edwards* was whether the plaintiff's work as a recruiter for an educational institution subjected her to the outside sales exemption. That plaintiff was originally hired as a Field Admissions Representative

(FAR), in which she would sell educational programs to prospective students.  *Edwards*, at *1.  The plaintiff was promoted to the position of Assistant Regional Manager (ARM), in which her duties included both sales and training of FARs.  *Id*.  Much like the district managers in this case, that plaintiff remained a FAR during her whole tenure and after her promotion was both a FAR and an ARM.  *Id*.  As an ARM, the plaintiff would make her sales presentations accompanied by FAR-trainees, would attend the FAR-trainees' own sales presentations, followed up with her FARs by phone, and listened to her FARs make phone calls to prospective customers.  *Id*.  Both parties agreed the plaintiff's duties as a FAR constituted outside sales.  *Id*. at *7.

The employer in *Edwards* argued the plaintiff's duties were primarily her FAR sales duties with some training of other sales personnel.  *Edwards*, *9.  In support of its argument, the employer cited cases holding that employees who sold similar education programs were subject to the outside sales exemption.  *Id*. at 8.  The court distinguished those other cases, however, because they did not involve an employee who has been promoted from mere sales to the managerial position of a sales trainer.  *Id*. at *9 ("Neither of those courts addressed the training component of ARM work.  Rather, they merely adjudicated FAR and FAR-like sales duties.").  In denying the employer's request for summary judgment, the court found:

> The evidence in this case establishes that most of the training component of plaintiff's ARM work was not exempt sales work.  For example, when plaintiff attended sales presentations made by her FAR-trainees, any sales made were credited to the trainee's account – not plaintiff's.  For the same reason, any work plaintiff did coaching, advising or observing her FAR-trainees either in-person or over the telephone cannot properly be considered sales or work "incidental to or in conjunction" with *plaintiff's* sales.

*Edwards*, at *9 (emphasis in original).

Much like the employer in *Edwards*, Defendants are claiming these district managers should be exempt from overtime pay because although they are now in management, they still also sell products.  Defendants are failing to recognize the drastic change in duties these Plaintiffs underwent once they were promoted from sales agent to district manager.  In granting Plaintiffs' Motion for Summary Judgment on their status as employees, this Court has already recognized the primary duty of the district manager is no longer to sell insurance but to now manage the sales agents.  Cornerstone's reason for promoting these Plaintiffs from sales agents to district managers was to have them manage and train the sales agents under them in their hierarchical system.

### III.    Pre-August 23, 2004 Outside Sales Exemption – The 20% Test

For work performed by Plaintiffs as district managers before August 23, 2004, the standard by which their status is evaluated is a pure mathematical test.  If the Plaintiffs spent more than 20% of their time on work other than their own personal sales and work incidental to or in conjunction with their own personal sales, they are not subject to the outside sales exemption.  29 C.F.R. §541.5.

All of the Plaintiffs who worked as district managers before August 23, 2004, have presented summary judgment evidence that they spent far in excess of 20% of their time each week on duties that had nothing to do with their personal sales: Bowman [App. 558]; Campbell [App. 561]; Gessner [App. 564]; Howell [App. 566]; Klein [App. 569]; Mann [App. 597]; Young [App. 258, 267, 270-286]; France [App. 340-341, 576]; Marshall [App. 594]; Matles [App. 389, 395-396, 582]; Quintero [App. 408-409, 586]; Thompson [App. 441-443, 453, 591]; Vogler [App. 475, 464-474, 579]; and Wike [App. 500, 503-505, 588]

In fact, Plaintiffs were able to identify far more than 20% of their time that was required to be spent in various standing, weekly meetings, such as in-house agent training sessions, recruiting sessions, call-in conferences (where the agents would call in to the district manager their scheduled appointments and sales figures and the district manager would report those to his or her regional manager), and turn-in meetings. [Id.] Although these standing meetings account for more than 20% of the district managers' time each week, they are not, by any means, the only time the district managers spend training and managing their sales agents.

The Court should deny Defendants' request for summary judgment as to these Plaintiffs who worked as district managers before August 23, 2004.

## IV.    Post-August 23, 2004 Outside Sales Exemption – The Primary Duty Test

Several of these Plaintiffs also worked as district managers for Cornerstone on and after August 23, 2004.  For this time, the Court's analysis of these Plaintiffs is conducted under the "primary duty" test.  The standard for determining whether the outside sale exemption applies is set forth in 29 C.F.R. §541.500:

(a)    The term "employee employed in the capacity of outside salesman" in section 13(a)(1) of the Act shall mean any employee:

(1)    whose primary duty is:

(i)    making sales within the meaning of section 3(k) of the Act, or

(ii)    obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and

(2)    Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

(b)    The term "primary duty" is defined at §541.700.  In determining the primary duty of an outside sales employee, work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall be regarded as exempt outside sales work.  Other work that furthers the employee's sales

efforts also shall be regarded as exempt work including, for example, writing sales reports, updating or revising the employee's sales or display catalogue, planning itineraries and attending sales conferences.

29 C.F.R. §541.500. The term "primary duty" is defined generally for all types of exemptions, in part, as follows:

The term "primary duty" means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole.

29 C.F.R. §541.700.

Unlike the 20% test, the primary duty test is not necessarily based on the amount of time the employee spends on particular tasks. "[A]n employee's 'primary duty' cannot be ascertained by applying a simple 'clock' standard that contrasts the amount of time each day an employee spends on exempt and nonexempt work." *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1227 (5th Cir. 1990). Consequently, even though Plaintiffs have testified they spent most of their time on managerial duties that were not part of their own sales, this is merely one of the factors the Court should consider.

In this case, the totality of the circumstances demonstrates the primary duty of these Plaintiffs, as district managers, was to manage and train sales associates. Although they were required to maintain personal sales production, that was not their primary duty. The Court need look no further than Defendants' own documents to determine the primary role of its district managers (which were previously called sales trainers) was not their own sales.

Defendants conducted Cornerstone University, which was a training session for managers. In one of the documents expressly addressed to district managers,

Defendants admit the primary role of district managers is to manage the sales agents under them:

> As a Sales Trainer/District Manager, you have a variety of roles, however, **your primary role is that of role model, mentor and coach for the agents on your team**.   Your focus should be on helping your team members achieve their dreams.

[App. 538 (emphasis added)]  Likewise, the addendum contract Defendants required an employee to sign upon becoming a district manager outlines the duties of a district manager.  These duties begin with recruiting and training new sales agents and address various other managerial tasks that do not further the district managers' own sales. [App. 48, 420]  This Court reiterated the district managers' responsibilities in its Order on the Motion for Summary Judgment regarding employment status, as follows:

> District managers' responsibilities were to recruit and train new sales agents, see that agents under them complied with the agent contracts and with Cornerstone's rules, procedures and guidelines, inform Cornerstone of any violations by a sales agent, safe guard leads obtained through Cornerstone's "LEAD Program," and distribute the leads to sales agents under them.

[Doc. #104, p. 5]

This Court has also specifically stated that one of the reasons it found Plaintiffs were employees is because, "**as managers, Plaintiffs' primary job no longer involved actually selling Defendants' insurance policies**, but, rather, involved managing insurance agents and managers under them."  [Doc. #123, p. 8 (emphasis added]

Although each of the Plaintiffs might state their primary duty as a district manager slightly different, they all testified that their primary duty involved management of the sales agents under them, primarily with a focus on training.  [Mann, App. 597-598; Dodson, App. 572; France, App. 576; Jetter, App. 574; Marshall, App. 595; Matles, App. 582-583; Quintero, App. 585-586; Thompson, App. 430, 591-592; Vogler,

App. 461, 463, 579-580; Wike, App. 588-589]  More important, none of them described their primary duty as making sales outside the office.  [*Id.*]

When analyzing the primary duty of district managers, it is important to understand why Cornerstone placed an emphasis on their role as managers. Cornerstone is designed under a hierarchical system.  It has a high turnover of sales agents.  Consequently, it relies heavily upon district managers to train this continual flow of new sales agents so they can go into the field and sell Cornerstone's products. Mark Mann, who was a district manager for more than six years before being fired for bringing this lawsuit, explained his primary duty was "to train rookie agents so they could get into the field and make money for Cornerstone," later adding:

> The Cornerstone hierarchy system is created so that the company relies on District Managers to train the rookie sales agents.  There is a lot of turnover in agents, so the company could not be productive without a strong training force getting those agents to be productive.

[App. 598]  Eric Dodson explained the importance of his role as a manager as follows: "my Regional Sales Leader and Cornerstone relied on my ability to manage, train, and mentor the sales agents for the success of the hierarchy and the company."  [App. 572] Glenn Marshall also mentioned the importance of his role as a manager to the Cornerstone system: "Cornerstone and my regional managers relied on me to make sure the sales agents were trained and producing effectively."  [App. 595]

In order to reach the conclusion that outside sales are the primary duty of the district managers, Defendants have to take the position that every minute the district managers are outside the office they are working toward their own sales.  This is not the case.  All of the district managers spent a portion of their time outside the office training their sales agents in a way that was not incidental to or in conjunction with their own outside sales.  For example, all of the district managers testified they spent part of their

time in the field observing their sales agents make appointments and then offering advice and critiques of the agents' presentations. The district manager would not share the credit for those calls.[2] District Managers also provided training to their sales agents in between their own appointments. Although the time spent in the appointment would constitute the district manager's own sale, the time before and after the appointment that the district manager spent training the agent in the field was not part of that sale and did not further the district manager's own productivity. In fact, several district managers complained that taking agents with them made it more difficult to close a sale, but they took the agents along because it was part of their duty to train.

The term "primary duty" is defined as, "the principal, main, major or most important duty that the employee performs." 29 C.F.R. §541.700(a). The most important duty the district managers performed was the day-to-day management of Cornerstone's sales agents. Not only did this duty of managing the team of sales agents take most of the district managers' time, it was the reason Cornerstone had district managers. Although the district managers still had to maintain their own sales, their primary job no longer involved selling the policies, but managing the sales agents under them in the hierarchy.

---

[2] Although the district managers make an overwrite commission on all their agents' sales, managers would have made just as much money if they did not go to the agent's appointment. Consequently, attending those appointments does not constitute sharing commissions.

## PRAYER

Plaintiffs request the Court deny Defendants' Motion for Partial Summary Judgment on the issue of outside sales exemption and find none of these Plaintiffs are exempt from receiving overtime pay because of the outside sales exemption.

Respectfully Submitted,

WATTS GUERRA CRAFT, LLP

By:    /s/ Francisco Guerra, IV.
             Mikal C. Watts
             State Bar No. 2098120
             Francisco Guerra, IV.
             State Bar No. 00796684
             Bank of America Plaza
             300 Convent, Suite 100
             San Antonio, Texas 78205
             (210) 527-0500
             (210) 527-0501 Facsimile
             mcwatts@wattslawfirm.com
             fguerra@wattslawfirm.com

## CERTIFICATE OF SERVICE

I certify that a true copy of the above and foregoing was served on each attorney of record or party in accordance with the *Federal Rules of Civil Procedure* on the 1st day of October, 2009.

    /s/ Francisco Guerra, IV.
Francisco Guerra, IV.